# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

**Jury Trial Demand**

**AMENDED VERIFIED COMPLAINT**

**Case No.:**

John Doe,

     Plaintiff,

v.

University of St. Thomas,

     Defendant.

Plaintiff John Doe ("Plaintiff") as and for his Complaint against University of St. Thomas, Minnesota ("St. Thomas") respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.    John Doe seeks damages, declaratory and injunctive relief from the unlawful actions taken and procedures employed by Defendant St. Thomas and its agents which resulted in the wrongful suspension of Plaintiff, then a first-year freshman.  The suspension was the result of a rigged and unfair disciplinary process put in place to reach a pre-determined result, with deliberate disregard for the consequences to Plaintiff, in violation of both state and federal law.

## THE PARTIES

2.      Plaintiff John Doe, a full time student at St. Thomas, is a citizen of the State of Wisconsin.

3.      Defendant University of St. Thomas, Minnesota is a private, Catholic liberal arts college and a domestic non-profit corporation incorporated in Minnesota, with its principal place of business located at 2115 Summit Ave, St. Paul, Minnesota 55105.

## JURISDICTION AND VENUE

4.      This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and under 28 U.S.C. § 1367 because: Plaintiff states claims arising under the Constitution and laws of the United States, including Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88; and the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

5.      Plaintiff also invokes this Court's jurisdiction pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

6.      This Court has personal jurisdiction over St. Thomas on the grounds that it is conducting business within the State of Minnesota.

7.      Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because St. Thomas is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL BACKGROUND

**University of St. Thomas, Minnesota**

8.     St. Thomas is a private Catholic university with an undergraduate student population of 6,240 and a graduate student population of 4,005.

9.     During the 2014-2015 academic year, the United States Department of Education ("DOE") distributed $124,754,432,059.00 to public and private colleges and universities for students attending their schools.  Of that amount, $3,095,560.00 was distributed for students attending St. Thomas.

**B.     Growing National and Federal Pressure to Hold Male Students Responsible for Sexually Assaulting Female Students**

10.     This case arises amidst a growing national controversy stemming from threats by the Department of Education's Office of Civil Rights ("OCR") to withhold federal education dollars in order to compel colleges and universities to address so-called "sexual violence" on campuses.

11.     OCR's threatened withholding of federal funds puts great pressure on St. Thomas and other universities to treat male students accused of sexual misconduct with a presumption of guilt and to simply punish the male student in order to avoid jeopardizing the flow of taxpayer dollars, under the guise of making campuses safe for female students.

12.     As detailed below, during all relevant times, St. Thomas and other universities were under federal scrutiny from the DOE for alleged indifference to sexual violence on campus in violation of Title IX, and for violations of the Clery Act, which requires

colleges to keep and disclose information about crime on and near their respective

campuses.  Title IX compliance is monitored in part by the DOE which can impose civil

penalties and can suspend institutions from participating in federal student aid programs.

13.     Upon information and belief, St. Thomas' violations of Plaintiff's rights occurred

in part because of threats by the federal government that universities could lose federal

funding or face other adverse consequences for not finding male students like Plaintiff

responsible for sexually assaulting female students.  Evidence of this pressure includes

but is not limited to, The White House's April 2014 report entitled "Not Alone" which

encouraged schools to combat sexual assault of women on campuses and warnings that if

colleges do not adhere to Title IX they "risk[] losing federal funds" and/or face potential

lawsuits filed by the Department of Justice."

14.     It was under these pressures and this climate that the allegations against Plaintiff

were investigated and adjudicated.

**D.     Federal Statutory and Regulatory Requirements Concerning Allegations of
        Sexual Assault.**

15.     The issue of sexual assaults on college and university campuses is primarily

addressed by an act of Congress known as Title IX of the Education Amendments of

1972, 20 U.S.C. §§ 1681-1688.  Title IX applies to all public and private educational

institutions that receive federal funds, including colleges and universities.  The statute

prohibits discrimination on the basis of sex in a school's "education program or activity,"

which includes all of the school's operations.  A school specifically agrees, as a condition

for receiving federal funds, to operate all of its programs and activities in accordance

with Title IX and the Department of Education's Title IX regulations. This agreement is known as an "assurance of compliance." In this respect, Title IX is no different from other federal legislation that conditions the entitlement to federal funds on adherence to a federal regulatory scheme.

16.    St. Thomas, as a recipient of federal funds, is bound by Title IX and its regulations, and, upon information and belief, has executed an assurance of compliance.

17.    Since regulations were first promulgated under Title IX in 1972, there has been a requirement that a school "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or its regulations. Both the Department of Education and the Department of Justice have set forth this requirement by way of regulation. It has also long been recognized by "[t]he Supreme Court, Congress, and Federal executive departments and agencies . . . that sexual harassment of students can constitute discrimination prohibited by Title IX." "Sexual Harassment" is broadly defined as "unwelcome conduct of a sexual nature" that includes sexual intercourse, sexual assault, and rape. Student-on-student sexual harassment is prohibited by Title IX, as are other forms of sexual harassment.

18.    The Office for Civil Rights ("OCR") of the Department of Education investigates and administratively enforces Title IX as it relates to sexual harassment. In 2001, OCR promulgated regulations pursuant to notice-and-comment rulemaking in a document entitled "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" ("2001 Guidance"). OCR issued these

regulations to "continue[ ] to provide the principles that a school should use to recognize and effectively respond to sexual harassment of students in its program as a condition of receiving Federal financial assistance."

19.     Title IX's regulations, including the 2001 Guidance, have the force and effect of law, for they affect individual rights and obligations, and were the product of notice-and-comment rulemaking.

20.     In the 2001 Guidance, OCR recognized that "procedures adopted by schools will vary considerably in detail, specificity, and components, reflecting differences in audiences, school sizes and administrative structures, State or local legal requirements, and past experience." Nevertheless, OCR has identified a number of factors to be used in determining whether a school's procedures satisfy the "prompt and equitable" requirement of the regulations.

21.     First, in a section entitled "Due Process Rights of the Accused," OCR states that the procedures must not only "ensure the Title IX rights of the complainant," but must do so while "according due process to both parties involved." This Title IX "due process" requirement applies to both state and private colleges and universities.

22.     The "prompt and equitable" procedures that a school is required to implement to "accord due process to both parties involved" must include, at a minimum: "Notice . . . of the procedure, including where complaints may be filed"; "Application of the procedure to complaints alleging [sexual] harassment . . ."; "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence"; "Designated and reasonably prompt timeframes for the major stages of the

complaint process"; and "Notice to the parties of the outcome of the complaint . . . ."

23.    A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment," which includes "alleged sexual assaults."

24.    In April 2011, OCR issued a "significant guidance document" commonly referred to as the "Dear Colleague Letter." The Letter reaffirms the vitality of the 2001 Guidance and is OCR's latest interpretation of Title IX as it relates to sexual assault proceedings on campus. As set forth in the Letter, OCR states that compliance with Title IX requires the following:

a.    A school's "Title IX coordinator [the official charged with compliance] should review the [school's] disciplinary procedures to ensure that the procedures comply with the prompt and equitable requirements of Title IX."

b.    "Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence, once notified that the police department has completed its gathering of evidence . . . , the school must promptly resume and complete its fact-finding for the Title IX investigation."

c.    The complainant and the accused student "must have an equal opportunity to present relevant witnesses and other evidence."

d.    The complainant and the accused student "must be afforded similar and timely access to any information that will be used at the hearing. For example, a school should not conduct a pre-hearing meeting during which only the [complainant] is present and

given an opportunity to present his or her side of the story, unless a similar meeting takes

place with the [accused student]."

e.      "Schools must maintain documentation of all proceedings, which may include

written findings of fact, transcripts, or audio recordings."

f.      "[S]chools [should] provide an appeals process."

g.      "In sexual violence cases, the fact-finder and decision-maker also should have

adequate training or knowledge regarding sexual violence."

h.      "If an investigation or hearing involves forensic evidence, that evidence should be

reviewed by a trained forensic examiner."

**E.     St. Thomas' Sexual Misconduct Policies and Procedures**.

25.     St. Thomas' "Sexual Misconduct Policy and Procedures" ("Policies and

Procedures Manual") sets forth the school's policies and procedures for investigating and

adjudicating allegations of sexual misconduct.  See Exhibit 1 – Sexual Misconduct Policy

and Procedures.

26.     St. Thomas represented in the Policies and Procedures Manual that its policies and

procedures concerning sexual assault complied with the requirements of Title IX.

27.     In the June 2015 Policies and Procedural Manual "Consent" is defined as "…

conduct or words that indicate a person freely agrees to engage in a sexual act at the time

of the act, subject to the following:  * In order to give consent, one must be of legal

age.  * Consent to one form of sexual activity does not imply consent to other forms of

sexual activity.   *Silence or failing to resist a sexual act does not constitute consent.   *A

current or previous relationship does not imply consent. *A person who is asleep, unconscious or substantially impaired by drugs, alcohol, disability or other means, or who lacks full knowledge or information of what is happening, cannot consent to a sexual act. This is true regardless of whether the person voluntarily or involuntarily consumed drugs or alcohol. * The use of alcohol or other drugs does not excuse behavior that violates this policy. *Corroboration of a victim's testimony is not required to show a lack of consent. * UST maintains a separate Consenting Relationships policy applicable to students, faculty and staff that, depending on the circumstances, prohibits or strongly discourages romantic, intimate or sexual relationships involving person of unequal power, even when consent is present. Covered persons are expected to comply with the Consenting Relationship Policy."

28.     Under the June 2015 Policies and Procedural Manual, a St. Thomas student who wished to assert a sexual assault complaint against another student was to initiate the process in one of the following manners: (A) contacting St. Thomas Public Safety or local police if in an emergency situation, (b) contacting a "Confidential Resource" made available through St. Thomas, (c) contacting a "Trained Responder" made available through St. Thomas, or (d) contacting local law enforcement with or without the assistance of St. Thomas.

29.     Once a student submitted a charge of sexual assault to St. Thomas, the Policies and Procedures Manual mandated that the following steps be taken:

a.     Upon receipt of an "Assertion" or "Complaint", the Trained Responder must

promptly notify the Title IX Coordinator as well as the designated Response Manager for the particular complaint if the Trained Responder was not also the designated Response Manager.

b.      The designated Response Manager then makes a determination of "whether interim action is reasonably necessary or appropriate to protect the parties and the broader UST community, pending completion of the response and resolution process." If the designated Response Manager is not available and the Title IX Coordinator determines that immediate action is necessary, the Title IX Coordinator is authorized to take or direct that action. Examples of interim actions include, but are not limited to:

i.      Establishing a "no contact" order,

ii.      Prohibiting the Respondent from entering or being on St. Thomas property,

iii.      Prohibiting the Respondent from participating in St. Thomas sponsored events,

iv.      Changing the on-campus residency of either the Complainant or the Respondent,

v.      Prohibiting the Respondent from residing in a St. Thomas residence,

vi.      Changing the student or employee status of the Complainant or the Respondent,

vii.      Changing the class schedule of either the Complainant or the Respondent,

viii.      Issuing a timely warning of any substantial threat or danger to the community,

ix.      Making information about orders for protection and harassment restraining orders available to the Complainant, and

x.      Notifying and consulting with appropriate St. Thomas administrators, faculty, and staff members.

c.      Next, the designated Response Manager must appoint a Process Advisor to contact

the Complainant.  If the "formal resolution process" is followed, the Response Manager must also appoint a Process Advisor for the Respondent.  The same Process Advisor can be appointed for both the Complainant and the Respondent and the Response Manager can also serve as the Process Advisor.  The role of the Process Advisor is to promptly meet with the Complainant to:

i.      Review the allegations of sexual misconduct, obtain additional information, and advise or support the Complainant with respect to resolution and process of the complaint

ii.     Inform the Complainant of availability and right to resources,

iii.    Review with the Complainant the policy and procedures governing the process, including:

1.      The option to pursue informal or formal resolution processes,

2.      The right to contact law enforcement and to pursue civil remedies outside of St. Thomas,

3.      The available options for interim action or reasonable accommodations,

4.      Confidentiality provisions, and

5.      The prohibition on retaliation.

iv.     Address the Complainant's questions about the policy and procedures governing resolution of the claim,

v.      Ask the Complainant whether the Complainant wishes to proceed formally or informally, and

vi.     Set up a time for the Process Advisor to have a follow up meeting with the Complainant.

d.      After the Process Advisor meets with the Complainant, the Process Advisor must update the Response Manager regarding the meeting and any further information the Process Advisor learned about the allegations.  If the Complainant does not choose to proceed under the formal process, the Response Manager and the Title IX Coordinator will make a determination of whether the complaint should proceed under the formal process anyway.  To do this, the Title IX Coordinator and the Response Manager may consider the nature of the allegations and gather additional information to make the determination.

e.      If the allegations proceed under the "Informal Process", the process cannot result in a disciplinary sanction for the Respondent unless the Respondent is given an opportunity to review and respond to the allegations.  Even if disciplinary sanctions do result, they cannot include expulsion or termination of employment.  Under the "Informal Process" the following actions may take place:

i.      Mediation,

ii.     Discussion between the Complainant and the Respondent with appropriate involvement by St. Thomas,

iii.    A message communicated to the Respondent,

iv.     A change in the Complainant's work or class schedule or living arrangement.

f.      If the allegations proceed under the "Formal Process" an eleven (11) step process takes place.  The eleven (11) steps are:

i.      Submission of a Signed Complaint.  Under this step, the Complainant must submit a signed complaint setting forth the allegations against the Respondent.  If the

Complainant will not cooperate, the Title IX Coordinator can sign the complaint.

ii.      Review of Complaint with Response Manager(s).  The Process Advisor reviews the complaint with the Response Manager.

iii.     Assignment of a Factfinder.  Under this step, the Response Manager appoints a Factfinder or Factfinders to conduct an investigation into the allegations.  The Process Advisor and the Factfinder can be the same person, but when the allegations include force or non-consensual physical contact, the Process Advisor and the Factfinder will generally be different people.

iv.     Notice to Complainant.  The Response Manager must contact the Complainant to inform him or her of the Complaint, his or her rights, the initiation of a formal investigation, the name of the Process Advisor and the Factfinder, an estimate of time to complete the investigation, any conditions that impact the Respondent's status as a student or employees, and any other information the Response Manager considers important.

v.      Meeting with Respondent.  The Process Advisor must meet with the Respondent. The following must take place at that meeting:

1.      The Process Advisor must review the allegations with the Respondent and obtain additional information necessary to properly advise or support the Respondent with respect to the response and resolution process,

2.      Inform the Respondent of available resources and the Respondent's right to access these resources,

3.  Review the policies and procedures governing the process, specifically noting:

a.  The Respondent's rights under the Policies and Procedures Manual,

b.  The timing and deadlines for action,

c.  The confidentiality provisions, and

d.  The prohibition on retaliation.

4.  Address the Respondent's questions about the policy and procedures, and

5.  Set a time for the Process Advisor to follow up with the Respondent

vi.  Investigation.  The Factfinder(s) conduct an investigation with the following steps"

1.  Factfinding Process: The Factfinder(s) conduct a thorough investigation and impartial inquiry in the facts of the allegations.  They will seek to interview the Complainant, the Respondent, and any other key persons having information about the incident.  The Factfinders will also seek out additional information, documents, and materials they deem relevant to the investigation.  The Factfinder(s) must ensure that before the conclusion of the investigation, the parties have been provided a written summary of all allegations and defenses and have had an opportunity to respond.  The opportunity to respond includes: (1) an opportunity to identify relevant witnesses, documentation, and other physical evidence, (2) identify questions that may be asked of witnesses, and (3) provide responsive written or oral remarks.

2.  Application of AAUP Principles and Comments Relating to Academic Freedom: This applies only where the Respondent is a faculty member.

3.  Status Updates: The Factfinder(s) must provide updates of the proceedings at least

monthly, which must include, among other things, notice of any new material allegations or defenses and am opportunity to respond to the new allegations and defenses.

vii.     Determination of Responsibility. Using a preponderance of the evidence standard, the Factfinder(s) weigh the evidence and determine if it is more likely than not that the Respondent is responsible for the misconduct alleged. If the Factfinder(s) determine it is more likely than not that the Respondent committed sexual misconduct, the Factfinder(s) must make a determination that the policies have been violated.

viii.    Factfinding Report. The Factfinder(s) must document their findings of fact and determinations in a report and submit that report to the Response Manager and the Title IX Coordinator. The Title IX Coordinator must review the report and determine if the report and determination are consistent with St. Thomas policies, procedures, and practices. If the Title IX Coordinator determines the report and determinations are not consistent with St. Thomas policies, practices and procedures, the Title IX Coordinator has discretion to take appropriate action. What that action might be is not defined.

ix.     Responsive Action by UST. The Response Manager will review the report and determinations and work with appropriate St. Thomas administrators to determine what, if any, sanctions will be imposed or other action taken by St. Thomas.

x.      Notice of Outcome to Complainant and Respondent. The Factfinder(s) determination or other appropriate notice of outcome will be provided to the Complainant and Response in writing. That writing must include information about the appeal process and when the outcome will become final and must be sent within ten (10) working days of the Response Manager's receipt of the findings from the Factfinder(s).

g.     After the conclusion of the eleven (11) step process, either the Complainant or the Respondent may appeal the results of the formal process.  The grounds available for appeal are:

i.     That a procedural error occurred that substantially affected the outcome of the process,

ii.     That the decision was arbitrary and capricious or violated academic freedoms,

iii.     The discovery of significant new evidence not previously available that could have affected the outcome, or

iv.     That the sanction or other response by St. Thomas was excessively severe or grossly inadequate.

h.     The appeal process includes the following steps:

i.     Submitting an Appeal.  The appealing party must submit a signed written request to the appropriate Appeal Officer within ten (10) working days.  In cases where the Respondent is a student, the Appeal Officer is the Vice President for Student Affairs.

ii.     Appointment of an Appeal Board.  In cases where the Respondent is a student, the Appeal Officer can personally consider the appeal or, in his or her discretion, appoint an Appeal Board.  In cases where the Respondent is a staff or faculty member, an Appeal Board consisting of five (5) St. Thomas employees must be appointed.

iii.     Consideration of Appeal.  The Appeal Officer or Appeal Board, if one has been appointed will then hear the appeal.  The decision of an Appeal Board must provide the Appeal Officer with a written report of its findings within fifteen (15) calendar days.  The Appeal Officer must notify the Complainant and Respondent, in writing, of the findings

of the Appeal Board within ten (10) days.  The Appeal Officer must give the findings of the Appeal Board careful consideration but is not bound by those findings.  An Appeal Officer considering an appeal directly must make written findings and the final disposition of the appeal within ten (10) working days.  The Appeal Officer or Appeal Board decide the appeal subject to the following conditions:

1.      The Appeal Officer or Appeal Board are not to rehear the case, but rather to consider whether it is more likely than not that the grounds for appeal have been satisfied,

2.      The Appeal Officer or Appeal Board will review the appeal, the factfinding report and consider any previously undiscovered evidence, and

3.      May choose to meet with the parties and consider other additional information in his or her (or its) sole discretion.

iv.     No Further Appeal.  No further appeal is allowed under any faculty, staff, or student grievance polices.  However, the President has discretion to modify a decision in exceptional circumstances.

### The Night of December 11th and Morning of 12th, 2015

30.     On Friday, December 11, 2015, Plaintiff and Jane Doe attended a party in a dorm room in Brady Hall on the St. Thomas campus.

31.     Plaintiff arrived at the party at approximately 8:30 p.m., where he had approximately four (4) mixed drinks over the course of 1.5 hours.

32.     Plaintiff observed that Jane Doe, who Plaintiff had met previously on approximately two (2) occasions, arrived with a male individual named CH at approximately 9:15 p.m.

33.    At the party, Jane Doe approached Plaintiff and the two (2) made small talk.

34.    As they talked, Plaintiff and Jane Doe began to hold hands and were rubbing each other's backs.

35.    At one point, Plaintiff asked Jane Doe if she wanted to make out.  Jane Doe asked Plaintiff where he lived, and when he responded that he lived in Ireland Hall, Jane Doe said "maybe later."

36.    As the dorm room party wound down, around 10:30 p.m., a group of people from the party were leaving to go to a party at a house near campus.  At first, Jane Doe indicated she would return to her dorm room instead of going to the party.

37.    Plaintiff told Jane Doe that he would walk her back to her dorm from the house party later if that was what was deterring her from attending the party and Jane Doe agreed to attend the house party.

38.    On the way to the house party, Plaintiff and Jane Doe remained toward the back of the group walking to the party and were holding hands.

39.    When they arrived at the party, Jane Doe grabbed Plaintiff before they entered the house and they began "making out" in the backyard.

40.    After kissing for a few moments, Plaintiff and Jane Doe entered the party through the back door of the house and went into the basement.

41.    After approximately ten (10) minutes, Jane Doe stated to Plaintiff that she wanted to leave.

42.    Plaintiff offered to walk Jane Doe home and stated something to the effect that he

would not expect anything from Jane Doe just because he walked her home.

43.     Plaintiff and Jane Doe walked back to Jane Doe's dorm, Grace Hall, while holding hands and flirting with each other.  They entered the dorm at approximately 11:30 p.m.

44.     As Plaintiff and Jane Doe walked toward Jane Doe's dorm room, Jane Doe remarked that she hoped her roommate was not home yet.

45.     When Jane Doe entered her room, she found that her roommate was there.  She then suggested that she and Plaintiff go to the lounge that was located near her dorm room.

46.     While in the lounge, Plaintiff and Jane Doe were talking and kissing.

47.     Plaintiff asked if he could see Jane Doe's bra.  Jane Doe stated "Maybe later" and continued to kiss Plaintiff.

48.     At some point, Jane Doe climbed on top of Plaintiff, straddling him and began to unbutton his shirt while nibbling at his ear.

49.     Plaintiff asked again if he could see Jane Doe's bra.  She responded by showing him her bra, which was a black sports bra type bra.

50.     As Jane Doe continued to straddle Plaintiff, she alternated between biting his ear lobes and sucking on his chest.  At no point did Jane Doe ask to bite or suck on Plaintiff, and at no point did he specifically consent to being bitten or sucked on.

51.     While Jane Doe was straddling Plaintiff, he spanked her on the buttocks several times.

52.     Plaintiff then suggested that he and Jane Doe return to her dorm to see if her

roommate was still there.

53.     When Plaintiff and Jane Doe returned to her dorm, Jane Doe asked her roommate if she was still awake.  Jane Doe's roommate made a sort of humming sound that made it seem likely she had been sleeping.

54.     Plaintiff then suggested that he and Jane Doe go into the bathroom.

55.     Both Plaintiff and Jane Doe entered the bathroom.

56.     Once inside, they began kissing again, though neither asked for permission.  Jane Doe resumed biting Plaintiff's ear and unbuttoned his shirt the rest of the way. He did not consent by word or action to being undressed.

57.     As Plaintiff and Jane Doe continued to kiss and touch each other, they moved around, with each sitting or leaning on the bathroom counter at various points.

58.     As they continued to make out, Plaintiff took Jane Doe's hand and placed it on his pants, over his penis and then let her hand go.  Jane Doe stroked Plaintiff's penis through his pants and Plaintiff began to rub Jane Doe's crotch over her pants. Neither objected to this.

59.     As Plaintiff and Jane Doe continued to kiss and touch each other, Plaintiff unbuttoned both of their pants and then moved Jane Doe's pants down to around her knees.  He did the same with his pants. Neither objected to this.

60.     Plaintiff then took off his shirt and moved Jane Doe's underwear down to about her knee level.

61.     Jane Doe showed her approval when she began stroking Plaintiff's penis directly

at this point.

62.   Taking this as a clear indication of her consent, Plaintiff then inserted two (2) or three (3) fingers inside Jane Doe's vagina. She started to moan and began to stroke Plaintiff's penis much faster, causing Plaintiff pain.

63.   Because of the pain, Plaintiff took Jane Doe's hand and removed it from his penis, hoping she would stop or slow down. Jane Doe moved her hand back to Plaintiff's penis and began stroking it very quickly again. Plaintiff continued to move his fingers inside Jane Doe's vagina.

64.   As Jane Doe continued to vigorously stroke Plaintiff's penis, his pain continued to increase and he began to think that he wanted Jane Doe to stop stroking his penis.

65.   In order to stop the vigorous tugging, Plaintiff suggested that Jane Doe perform oral sex on him.

66.   Jane Doe responded "I only do that to boys I date".

67.   Plaintiff then respected her limits and responded "Whatever you're comfortable with."

68.   Plaintiff and Jane Doe then continued to kiss and touch each other. Jane Doe continued to vigorously stroke Plaintiff's penis until he could no longer stand the pain. Plaintiff never ejaculated. Plaintiff then removed his fingers from Jane Doe's vagina and observed that there was blood on his fingers.

69.   He made a surprised noise and thought to himself that Jane Doe must be having her period. Plaintiff then washed his hands in the sink, drying his hands on the hand

towel in the bathroom.

70.     Plaintiff then got dressed.  Jane Doe walked Plaintiff to the door, they exchanged goodbyes and Plaintiff left.

71.     Plaintiff left through the side door of the dorm at about 1:30 a.m. and went to the dorm room of a friend.

72.     There he talked with his friends about what had happened and they began to tease him about what had happened, so he called a female friend.

73.     The female friend said she would talk to him in the morning.  Plaintiff slept in his male friend's room that night.

74.     The following morning, Plaintiff texted with his female friend, inquiring about what he could say to Jane Doe so that she would know he didn't want a relationship but would not feel awkward about what had happened in the bathroom with the blood the night before.

75.     Plaintiff then decided that he would text Jane Doe telling her that he was not over his ex-girlfriend yet.  Jane Doe responded by text indicating that they should never talk about it again.

**G.**      █████████████████████████████████

76.     ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

77.     ████████████████████████████████████



78.

79.

80.

81.

82.

83.

84.

85.

86.

87. ███████████████████████████████████████████

██████████

88. ███████████████████████████████████████████

███████████████████████████████

**H.    Jane Doe Reports the Alleged Assault to Police on December 14, 2015**

89.    On December 14, 2015, Jane Doe contacted the St. Paul Police Department to report she had been sexually assaulted.  See Exhibit 2 – Initial Police Report.

90.    When an Investigator from the St. Paul Police Department arrived at Jane Doe's dorm room, Jane Doe was there with her parents and her sister.

91.    Jane Doe reported that she had told her sister about the sexual assault at approximately 7:00 p.m. on December 13, 2015 and reported it to her parents at approximately 8:00 p.m.  Jane Doe's parents arrived shortly after that and told her it was time to make a police report.

92.    Jane Doe reported to Investigator Maya Erickson that she and Plaintiff had talked in the common area of her dorm, but she told Plaintiff "nothing was going to happen."

93.    Plaintiff then asked to use the bathroom so Jane Doe took him to the bathroom in her dorm room.  She told Plaintiff he needed to be very quiet since her roommate was there and sleeping.

94.    Plaintiff then went into the bathroom, where he remained for a long time.

95.   Jane Doe became worried that Plaintiff had been in the bathroom for such a long time and opened the first door into the bathroom, which had a second door separating the sink from the toilet.  As Jane Doe did this, Plaintiff allegedly grabbed her and pushed her onto the sink with her back to the cabinets.  Jane Doe stated her head and back hit the cabinets.

96.   Plaintiff then began to kiss Jane Doe and she panicked, not knowing what to do. Plaintiff unbuttoned his shirt and tossed it to the ground before unbuckling his belt and removing his pants.

97.   Plaintiff then allegedly pulled down Jane Doe's pants and underwear and put his fingers inside her vagina.  After some amount of time, Plaintiff removed his fingers from her vagina.  They were covered in blood.

98.   Plaintiff then allegedly pushed Jane Doe to the ground, where she landed on her knees, and said "suck it baby."  Jane Doe said "no" and Plaintiff put on his clothes and left.

99.   During her statement to Investigator Erickson, Jane Doe pointed out a ring on her left ring finger and explained that it meant she was saving herself for marriage and began to cry, stating that now she would have to tell her future husband about what had happened with Plaintiff.

**Jane Doe gives a second statement to police on December 14, 2015**

100.   The following day, Jane Doe gave a second statement to investigators from the St. Paul Police Department.  See Exhibit 3 – Supplemental Police Report.

101.   There, Jane Doe explained to Investigator Paul Cottingham that on December 11,

2015, she was at a party with Plaintiff, who she had only exchanged pleasantries with in the past, in Brady Hall.

102.   She then went to a house party, along with Plaintiff, as part of a group.

103.   At the house party, Jane Doe was asked about the purity ring she wore on her left ring finger and explained to everyone, including Plaintiff, that it means that she was "saving herself for marriage."

104.   After being at the party for a short while, Jane Doe, who had consumed three (3) shots of Captain Morgan Rum that evening, felt she needed to return home.  Plaintiff offered to walk her home.

105.   When she and Plaintiff made it to the dorm, they went to a lounge on the second floor of the dorm to talk.  There, Jane Doe allegedly made it clear to Plaintiff that nothing physical would happen between them and told Plaintiff she would kiss him the following night.

106.   Plaintiff then used the bathroom in her dorm and Jane Doe went into the bathroom with Plaintiff because she feared he might not be feeling well due to his drinking.

107.   Once Jane Doe was in the bathroom, Plaintiff began to kiss her in the bathroom, shocking Jane Doe, who asked "What are you doing?"

108.   Plaintiff then allegedly placed his fingers inside her vagina and Jane Doe allegedly told him "it hurt."

109.   Plaintiff allegedly also reached into Jane Doe's shirt to touch her breasts.

110.   Plaintiff then allegedly pushed Jane Doe to her knees on the floor and said "suck it baby," referring to his penis.

111.    Jane Doe said "No" and Plaintiff asked "Why" before putting his clothes on and washing his hands.  Jane Doe then escorted Plaintiff to the door of the dorm building.

112.    After Jane escorted Plaintiff out of the dorm building, she began to feel upset and that she was sexually assaulted because she had allegedly made it very clear to Plaintiff that due to her purity ring and her desire to remain a virgin for marriage, Plaintiff should have known not to do what he did.

**Jane Doe gives a third statement to police on December 15, 2015**

113.    On, December 15, 2015, after speaking with counsel for Plaintiff, Investigator Cottingham contacted Jane Doe to inquire about whether she and Plaintiff had any physical contact in the common area of the dorm.  See Exhibit 3 – Supplemental Police Report.

114.    Investigator Cottingham asked Jane Doe if she was aware that St. Thomas had cameras in the common area, to which Jane Doe responded she was so aware.  He then asked Jane Doe if there had been any physical contact between her and Plaintiff in the common area.

115.    Jane Doe stated that they had held hands in the common room.

116.    Investigator Cottingham then asked Jane Doe if she and Plaintiff had kissed while they were in the common room.  Jane Doe admitted they had been kissing.

117.    Investigator Cottingham asked Jane Doe why she had omitted the hand holding and kissing from her telling of the events to both him and Investigator Erickson during their prior meetings.  Jane Doe apologized and stated that she had told others they had been kissing.

**Plaintiff Conducts an Investigation into the Events of the December 11 and 12**

118.   Based on Jane Doe's allegations, Plaintiff was arrested and booked into the

Ramsey County Jail on December 13, 2015 on suspicion of First-Degree Criminal Sexual

Conduct.

119.   While Plaintiff was in jail, his parents made arrangement for Plaintiff to obtain

counsel to represent him.

120.   When counsel arrived at the Ramsey County Jail to meet with Plaintiff, Plaintiff

explained that his sexual contact with Jane Doe was consensual.  He provided his counsel

with the identity of several witnesses who he felt had seen him and Jane Doe flirting and

kissing and also informed counsel that Jane Doe had been stroking his penis so

vigorously that it was raw and had an open sore on it.  Counsel for Plaintiff was able to

persuade jailers to allow him to retrieve his phone to take a photograph to document the

injuries to Plaintiff's penis.  That photograph is in the possession of Plaintiff's counsel.

121.   In addition, despite being informed by Associate General Counsel Abigail Crouse

that Plaintiff was not allowed to conduct his own investigation, and that doing so would

be used against him in determining his fate, Plaintiff conducted his own interview,

obtaining statements from five (5) witnesses regarding the event of December 11th and

12th.  See Exhibit 4 – December 16, 2015 Emails Between Abigail Crouse and Beau

McGraw.  There is no prohibition in law or University policy for a respondent to

endeavor to clear his own name. To so threaten Doe was an act of retaliation by the

University, which it carried through on when it increased his sanction on appeal.

122.    One such statement was provided by witness ZJ.  ZJ states that on the night of December 11, 2015, he first observed Jane Doe while she was in ZJ's dorm room, "making out" with an individual named CH.  ZJ left his dorm room and later observed Jane Doe arrive at the dorm party with CH.  Sometime after that, ZJ observed Plaintiff and Jane Doe talking and standing close together.  When the group left the house party, he observed Plaintiff and Jane Doe holding hands.  ZJ did not observe Plaintiff or Jane Doe at the party, but later than night, Plaintiff came to ZJ's dorm room and informed him of what happened with Jane Doe, including that he had "fingered" Jane Doe and Jane Doe had given him a "hand job", which had hurt Plaintiff while it was occurring.  ZJ later volunteered a statement that after he first observed Jane Doe making out with CH earlier that night, Jane Doe specifically asked ZJ not to tell anyone else about her behavior with other men that evening.

123.    A statement was also obtained from witness JK.  JK observed Jane Doe arrive with an individual named CH.  After CH left, JK observed Jane Doe flirting with and standing close to another individual.  At some point at the dorm party, JK observed Plaintiff and Jane Doe flirting and standing close to each other.  When the group left to go to the house party, JK observed Plaintiff and Jane Doe walking together and talking. At the party he did not see either Plaintiff or Jane Doe.  He did not see Plaintiff again until approximately 1:30 to 2:00 a.m.  At that time, Plaintiff came to the dorm room JK was spending the night in.  Plaintiff explained that he and Jane Doe had been kissing for a

while and then Jane Doe gave him a "hand job" while he "fingered" her. Plaintiff also explained that when he was done fingering Jane Doe, there was blood, and Plaintiff felt embarrassed and thought that Jane Doe was also embarrassed. Plaintiff explained that the "hand job" he received had been painful and complained of pain on his penis the following morning.

124.   A statement was also obtained from AL. AL knew Jane Doe from having "made out" with her several weeks prior to the dorm party. That night, he observed Jane Doe flirting with several individuals before he saw her talking with Plaintiff. AL later learned that CH and Jane Doe had "made out" in the bathroom at the party before CH left. Later that night while still in the dorm room, AL observed Plaintiff and Jane Doe kissing. As the group left for the house party, AL observed Plaintiff and Jane Doe holding hands while walking. At the party, AL did not see either Plaintiff or Jane Doe. AL later saw Plaintiff when he came to the dorm room AL was staying in. There Plaintiff explained that he had gone to Jane Doe's dorm room, where he ended up "fingering" her and she gave him a "hand job". Plaintiff stated that the hand job was painful and that when he removed his fingers from Jane Doe's vagina, there was blood all over.

125.   An additional statement was obtained from ER. ER stated that Plaintiff called her early in the morning of December 12, 2015 to ask for advice. Upon realizing ER had been sleeping, Plaintiff said he would call back in the morning. In the morning, Plaintiff and ER texted about what had happened the prior night. Plaintiff expressed regret over having "hooked up" with Jane Doe and was looking for a way to tell Jane Doe he did not want to become romantically involved with her without hurting her feelings or making

her feel bad about the awkward events of the night prior.  ER advised Plaintiff that he could say he was not over his ex-girlfriend from a long term relationship if he was trying to spare Jane Doe's feelings.

126.    Plaintiff also obtained a statement from CH.  CH stated that on December 11, 2015, prior to the dorm party, he was in his dorm room with Jane Doe.  In the dorm room, CH and Jane Doe were heavily kissing and touching each other inside the other's pants, but outside the underwear.  After this went on for quite some time, CH inquired about Jane Doe's ring, which he learned was a purity ring.  Jane Doe informed CH that she was looking for a serious relationship, to which CH indicated he was not.  CH and Jane Doe then went to the dorm room party where CH began trying to distance himself from Jane Doe.

**The Ramsey County Attorney's Office Forgoes Prosecution**

127.    By a letter dated December 17, 2015, the Office of the Ramsey County Attorney informed Investigator Cottingham that it would not be prosecuting Plaintiff because the facts and circumstances did not support charges.  The letter also noted that there was insufficient evidence to support Jane Doe's report of nonconsensual / forced sexual contact.  See Exhibit 5 – Denial of Prosecution Letter from Ramsey County Attorney.

**St. Thomas' Disciplinary Proceedings Against Plaintiff**

128.    On December 14, 2015, at 4:59 p.m., Plaintiff received an email from Dean of Students Linda Baughman-Terry informing him that Jane Doe had accused him of sexual assault.  The letter also informed Plaintiff that because of the allegation, his access to campus residences halls, including his own dorm room, had been revoked and that he

could only be on campus for purposes of going to class and taking finals. The letter also

informed Plaintiff that he was to schedule a time to meet with Dean Baughman-Terry and

during the meeting Plaintiff would be assigned a "Process Advisor" who would inform

him of how the investigation process would proceed and of his rights during the

investigation. See Exhibit 6 – December 14, 2015 Letter from Dean of Students.

129.   At 7:17 p.m. that same day, Plaintiff received a second email from Dean

Baughman-Terry containing a letter with more details about the investigation that would

take place. That letter informed Plaintiff that the Process Advisor on his case was Jesse

Langer, that the Factfinders assigned were Vern Klobassa and Dr. Jean Giebenhain, and

that Dean Baughman-Terry had decided to initiate the formal process. Plaintiff has never

been made aware of whether Jane Doe requested the matter to proceed formally or

informally. Plaintiff was also informed that the investigation could take up to 60 days.

See Exhibit 7 – December 15, 2015 Formal Investigation Email.

130.   Plaintiff, along with counsel, had an initial meeting with Dean Baughman-Terry

on December 16, 2015. Counsel was allowed to be present, but was informed by

Associate General Counsel Abigail Crouse that if his participation went beyond learning

about the process St. Thomas would apply, she would end the meeting. See Exhibit 4.

During that meeting, Plaintiff was informed of the basic allegations against him, provided

with basic information about the procedures St. Thomas would use against him, and

informed of the interim sanctions he would face. During that meeting, Crouse in the

presence of John Doe, Doe's father, Attorney McGraw, and the decision maker, Dean

Baughman-Terry, in response to a question by Doe's father as to why the matter would

proceed despite the fact that the State of Minnesota had denied prosecution, stated that she was not at all surprised that prosecution was denied as it was a he said she said and the State "always" denies prosecution of those cases.

131.  Prior to meeting with Dean Baughman-Terry, Plaintiff's counsel made a request to Abigail Crouse for a copy of the video recording made inside the lounge area of Grace Hall between 11:00 p.m. on December 11th and 2:00 a.m. on December 12th.  That request for the footage was "declined" by St. Thomas.  See Exhibit 4.  Upon information and belief, this video was subject to the Family Education Rights and Privacy Act (FERPA) and thus John Doe has a right to access and view this video as part of his education record, upon request.

132.  On December 16, 2015, at 2:46 p.m., Plaintiff received an email from Vern Klobassa requesting that Plaintiff schedule a meeting with Mr. Klobassa and Professor Jean Giebenhain. Plaintiff was informed this was an opportunity for him to provide evidence, identify witnesses, and suggest possible questions for witnesses.

133.  On December 17, 2015, at 3:21 p.m., Plaintiff received an email from Jesse Langer, introducing himself and giving Plaintiff information about the process that would occur.  The email included an offer to provide Plaintiff with assistance and attend investigative meetings with him.

134.  On December 20, 2015 at 9:20 p.m., Plaintiff informed Mr. Klobassa that he intended to attend the meeting with his attorney.  The initial meeting with the Factfinders was scheduled to take place on December 22, 2015, at 3:00 p.m.

135.  That meeting did take place on December, 22, 2015.  There, the Factfinders

questioned Plaintiff about the events of December 11th and 12th and requested that Plaintiff identify witnesses he felt had relevant information. In response, Plaintiff provided the Factfinders with a truthful account of the night and a list of witnesses.

136.   On January 4, 2016, at 3:37 p.m., Plaintiff received an email from Mr. Klobassa requesting Plaintiff detail which part of the events each witness could shed light on, identify witnesses that might have similar information, rank witnesses in terms of relevance and importance, and provide some questions Plaintiff wished to have the Factfinders ask the witnesses.

137.   Plaintiff, this time through his attorney, provided the requested information on January 11, 2016.  See Exhibit 8 – January 11, 2016 Letter from Beau McGraw to Abigail Crouse.

138.   On January 13, 2016, Mr. Klobassa requested screen shots of the text messages exchanged between Plaintiff and Jane Doe and between Plaintiff and ER.  Plaintiff provided those that same day.  See Exhibit 9 – Screen Shots of Text Messages.

139.   On January 25, 2016, Plaintiff received an email from Jesse Langer indicating that witness interviews would take place from January 25 to January 29, second interviews with Plaintiff and Jane Doe would take place from February 1 to February 5, and that the report would be finalized between February 8 and February 12.

140.   On January 27, 2016, Plaintiff received an email from Dean Mary Dunn, requesting a second interview with the Factfinders.  That interview was scheduled to take place on February 3, 2016 at 3:30 p.m.

141.   During that meeting Plaintiff was vigorously challenged by the Factfinders

regarding his timeline and the version of events on December 11th and 12th. Plaintiff

remained consistent in his telling of the events.

142.    That same day, Plaintiff received a draft of a statement and a Title IX Statement

Form from Mr. Klobassa, apparently drafted by Abigail Crouse for St. Thomas, who

requested that Plaintiff sign the documents to verify their accuracy. Plaintiff provided a

revised statement on January 29, 2016, which corrected a few inaccuracies in the version

he had been requested to sign.

143.    On February 9, 2016, Plaintiff received an email from Dean Baughman-Terry

indicating she expected to receive the final report from the investigation that same day.

The email requested that Plaintiff meet with her or the Title IX Coordinator.

144.    Plaintiff and his attorney met with Dean Baughman-Terry and Abigail Crouse on

February 10, 2016. Plaintiff was informed that he had been found responsible for non-

consensual sexual intercourse and would be suspended from St. Thomas immediately,

pending his right to file an appeal. Plaintiff was also provided a letter from Dean

Baughman-Terry setting forth her determination and his sanctions. See Exhibit 10 –

February 10, 2016 Letter from Dean of Students.

145.    At that meeting, Plaintiff and his counsel requested to see the report the

Factfinders had created. Plaintiff was not allowed to see the report. This too is a FERPA

violation. His counsel was allowed to see the report on February 12, 2016. Counsel was

taken to a small cold room on campus and presented with the report while St. Thomas

Associate Counsel Abigail Crouse sat across the table and watched counsel review the

Report. While Plaintiff's counsel reviewed the report, Associate Counsel Crouse stated

that Plaintiff could make things much easier for everyone, and receive a tuition refund, if he would just withdraw from St. Thomas.

146.   The "report" did not provide the identity of any witness contacted by the Factfinders, as all identifying information was redacted.  The report also contained other significant redactions of unknown, but presumably very important, potentially exculpatory, material.

147.   During review of the report, Plaintiff's counsel was able to determine that the Factfinders had contacted approximately 12 witnesses, including two (2) medical professionals.  The report stated that both Plaintiff and Jane Doe were credible and found that all contact until the parties were in the bathroom was consensual.

148.   The report determined that the contact in the bathroom was not consensual and did so based in large part upon the statement of Jane Doe's roommate, who was unable to say how Jane Doe got into the bathroom, but stated that she heard a toilet flush, heard the sink turn on, and then heard the bathroom door shut.  She heard nothing after that. Neither was she concerned enough to even attempt to contact the parties in the bathroom, contact an RA or campus security. She did not testify that she heard any sounds of an attack as Jane Doe alleged.

149.   The Factfinders made contact with two (2) medical professionals, an unnamed campus nurse and an unnamed female doctor.  Both medical professionals were questioned about the sore on Plaintiff's penis.  The first question they were asked was if the sore on Plaintiff's penis could have been the result of self-harm, done to cover up his actions with Jane Doe.  Both medical professionals expressed doubt this was the case.

150. 

151.    The report also indicated that Jane Doe was not challenged regarding her omissions and five different versions of the timing and events, even though she had provided inconsistent statements at the hospital and to law enforcement, whereas John Doe was repeatedly challenged regarding his version of the events. Plaintiff remained consistent, though he was questioned under duress multiple times, including interviews by police investigators, his lawyer whom he only met for the first time at the police station, various high-ranking University administrators, and his friends after the encounter.

**St. Thomas' Determination.**

152.    On February 13, 2016, Plaintiff received a letter from Dean Baughman-Terry informing him that, as a result of the investigation, he had been found responsible for violation of the University of St. Thomas Sexual Misconduct Policy, specifically *"Non-*

*consensual sexual intercourse*   *Non-consensual sexual intercourse is: (1) any sexual*

*intercourse or penetration (anal, oral or vaginal) however slight (2) by a penis, tongue,*

*finger, or any object (3) by any person upon any other person (4) without consent and/or*

*by force.*  See Exhibit 10.

153.   The letter also informed Plaintiff of the following: (1) he was suspended from St.

Thomas until the first day of the fall semester of 2017, that he was to vacate his dorm

room by 6:00 p.m. on February 13, 2016, that he was not allowed to be on the St. Thomas

campus for any reason during his suspension, that he was not to have any contact with

Jane Doe, and that if he wished to appeal the decision that he was a rapist, he had the

right to do so.

154.   On March 10, 2016, Plaintiff submitted a written statement to Dr. Karen Lange,

Vice President for Student Affairs.  In that document, Plaintiff set forth four (4) reasons

why the determination he had committed non-consensual sexual intercourse should be

overturned. Plaintiff also provided a statement from a medical professional trained in the

assessment of sexual assault victims whom he contacted, which called into question the

conclusions reached by the non-expert medical personnel St. Thomas had contacted and

relied so heavily upon during its purported investigation.  See Exhibit 11 – March 10,

2016 Appeal Letter.

155.   On April 12, 2016, Plaintiff received a letter from Dr. Karen Lange stating that his

appeal was denied and his suspension would be upheld with modifications.  The

modification was that Plaintiff would be able to finish his classes, including finals for the

Spring 2016 semester, but would then be barred from campus until the start of the Spring

2018 semester, a six month extension of the length of the original suspension imposed,

with no rationale for doing so or explanation for how it was perfectly safe for Plaintiff to

remain on campus until the end of the semester, but somehow so unsafe that his

suspension needed to be lengthened.  See Exhibit 12 – April 12, 2016 Letter from Vice

President for Student Affairs.

156.    Plaintiff was not provided a copy of the appeal board report, but, like before, was

offered an opportunity to review it.  Counsel for Plaintiff made that request and on April

14, 2016, was allowed to review the appeal board report under similar circumstances as

the Factfinders Report, in a small cold room, while being observed by St. Thomas office

personnel whom he was instructed not to speak to.

157.    Counsel was not allowed to make a copy or take a photographs of the appeal board

report, but could take notes.  The appeal board report showed that the appeal board

disregarded Plaintiff's new medical evidence and was almost entirely concerned with the

length of the suspension Plaintiff would receive.  No witnesses were interviewed and the

board chose not to meet with either of the parties.

## COUNT I
## Declaratory Judgment – Title IX

158.    Plaintiff repeats and realleges paragraphs 1 through 157 as if fully set forth herein.

159.    Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, and the

regulations promulgated thereunder require a school receiving federal funds to "adopt

and publish grievance procedures providing for the prompt and equitable resolution of

student . . . complaints alleging any form of sexual harassment, including sexual assault. These procedures must "accord[ ] due process to both parties involved . . . ."

160.    Upon information and belief, St. Thomas receives federal funds and must comply with Title IX.

161.    The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum: (a) "[n]otice . . . of the procedure, including here complaints may be filed"; (b) "[a]dequate, reliable, and impartial investigation of complaints"; (c) "the opportunity to present witnesses and other evidence"; and (d) "[d]esignated and reasonably prompt timeframes for the major stages of the complaint process." A school must also ensure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment," which includes "alleged sexual assaults."

162.    As written, the St. Thomas' student disciplinary process in effect in the 2015-2016 school year, including the Sexual Misconduct Policy and Procedures, violated Title IX and the regulations thereunder, which have the force of law, including the requirements that: the procedures comport with due process, be "prompt and equitable," uphold the preponderance of the evidence standard, and St. Thomas deliver to Plaintiff written notice of the outcome of the investigation and the rational therefor.

163.    Those violations include, but are not limited to, the following: (a) the lack of a meaningful hearing process wherein Plaintiff had an opportunity to present evidence and subject the evidence against him to adversarial testing, (b) failure to provide Plaintiff with written notice of the determination and the rationale therefor, (c) the lack of a meaningful

right to appeal because Plaintiff was never made aware of the evidence against him and

because the appeal was not as of right, but rather a request for appeal, (d) and presuming

Plaintiff's guilt by maintaining a shocking policy that explicitly states that corroboration

of the allegations against Plaintiff is unnecessary.

164.   As implemented, St. Thomas' student disciplinary process in effect during the

2015-2016 school year, including the Sexual Misconduct Policy and Procedures, violated

Title IX and the regulations thereunder, which have the force of law, including the

requirements that the procedures comport with due process, be "prompt and equitable,"

uphold the preponderance of the evidence standard, and St. Thomas deliver to Plaintiff

written notice of the outcome of the investigation and the rational therefore.  Those

violations, which are described above, include, but are not limited to, the following: (a)

the lack of a meaningful hearing process wherein Plaintiff had an opportunity to present

evidence and subject the evidence against him to adversarial testing, (b) failure to provide

Plaintiff with written notice of the determination and the rationale therefore, (c) the lack

of a meaningful right to appeal because Plaintiff was never made aware of the evidence

against him and because the appeal was not as of right, but rather a request for appeal, (d)

and presuming Plaintiff's guilt by maintaining a policy that explicitly states that

corroboration of the allegations against Plaintiff is unnecessary.

165.   As applied to Plaintiff, St. Thomas' student disciplinary process in effect during

the 2015-2016 school year, including the Sexual Misconduct Policy and Procedures,

violated Title IX and the regulations thereunder, which have the force of law, including

the requirements that the procedures comport with due process and be "prompt and

equitable." Those violations which are described above, include, but are not limited to, the following: (a) the failure to perform a threshold evaluation of the charge, including denying Plaintiff the right to tell his side of the story; (b) the failure to conduct a "thorough, reliable and impartial" investigation with a trained investigator; (c) the failure to set an appropriate, fair hearing date that would have allowed Plaintiff to rely on exculpatory evidence; (d) the failure to provide fair and meaningful notice of the charges; (e) the refusal to contact witnesses identified by Plaintiff; (f) the failure to provide an unbiased disciplinary process and tribunal; (g) the failure to ensure that Plaintiff be presumed innocent and that St. Thomas had the burden of proof; (h) the failure to ensure that there be sufficient evidence to support the Factfinders' conclusion; (i) otherwise acting to achieve a predetermined result, *i.e.*, a finding that Plaintiff committed sexual assault or some related offense.

166.    Pursuant to the provisions of 28 U.S.C. §§ 2201, 2202, and 1651, Plaintiff is entitled to (a) a declaratory judgment that St. Thomas' 2015-2016 student disciplinary process, including the Sexual Misconduct Policy and Procedures, was, as written, violated Title IX (including its due process requirements); (b) a declaratory judgment that St. Thomas' student disciplinary process, including the Sexual Misconduct Policy and Procedures, as implemented, violated Title IX (including its due process requirements); (c) a declaratory judgment that the St. Thomas' student disciplinary process, including the Sexual Misconduct Policy and Procedures, as applied to Plaintiff, violated Title IX (including its due process requirements); and (d) further necessary or proper relief.

<u>Count II</u>
**Violation of Title IX – Erroneous Outcome from a Flawed Proceeding**

167.   Plaintiff repeats and realleges paragraphs 1 through 166 as if fully set forth herein.

168.   Title IX prohibits discrimination on the basis of sex in a school's "education program or activity," which includes all of the school's operations.

169.   Upon information and belief, St. Thomas receives federal funds and must comply with Title IX.

170.   A victim of discrimination based on his or her gender has, under Title IX, a private right of action against the offending school for monetary damages and equitable relief.

171.   As set forth above, St. Thomas engaged in a series of actions that ultimately resulted in the erroneous finding that Plaintiff committed sexual misconduct *i.e.*, "Non-consensual sexual intercourse." This represents disparate treatment of Plaintiff by St. Thomas on the basis of his sex.

172.   As fully set forth above, there were significant evidentiary weaknesses underlying St. Thomas' finding, including:

a.     the absence of any evidence Jane Doe objected to the sexual contact,

b.     ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████.

c.     Jane Doe's continually changing version of events, including telling hospital

personnel that Plaintiff ripped off her shirt, which was never produced as evidence, and

that Plaintiff sucked and bit her nipples while telling police Plaintiff fondled her breasts

over and under her shirt and her differing stories to police and hospital staff regarding

how and why she was in the bathroom with Plaintiff,

d.     That Jane Doe's version of events where she was thrown into a cabinet and the

forced to the ground suffering pain and tenderness were not corroborated by any

objective findings, and that Jane Doe's roommate was just in the next room, and never

testified that she heard anything of concern.

173.   In addition to the lack of evidence against Plaintiff, there were, as set forth above,

numerous procedural flaws that affected the proof, including the lack of an appropriate

investigation by a trained investigator; the refusal to provide Plaintiff with a hearing

wherein he could contest the allegations against him, the prohibition on Plaintiff being

allowed to conduct his own investigation or contact any potential witness, St. Thomas

construing Plaintiff conducting his own investigation as admission of guilt, the

presumption of guilt applied to Plaintiff from the outset, and the impermissible shifting of

the burden of proof to Plaintiff.

174.   The erroneous outcome of the hearing and purported appeal can only be explained

by gender bias against males in cases involving allegations of sexual assault.  This bias is

reflected in the patterns of decision making by St. Thomas throughout the entire process

and by the biased questioning in which Jane Doe was not subject to the same scrutiny of

self-injury to her vagina as John Doe was with respect to his own penis.

175.    Moreover, upon information and belief, in all, or in virtually all, cases of campus sexual misconduct at St. Thomas, the accused student is male and the accusing student is female.  St. Thomas has created an environment in which it is impossible for a male accused of sexual assault to receive the due process guaranteed by Title IX.  This significant gender-based statistical disparity demonstrates the existence of discrimination.  In fact, St. Thomas impermissibly presumes male students "guilty until proven innocent" based on invidious gender stereotypes and has codified this by policy requiring no corroboration from victims.

176.    There are at least four causes for this discriminatory environment at St. Thomas.  First, acquittal of an accused male student carries the threat that the Department of Education's Office for Civil Rights could institute an investigation that would result in St. Thomas' loss of federal funding.  There could also be a civil suit filed by the female complainant, a type of suit that garners much more publicity than a suit by the accused and convicted male student.

177.    Second, the St. Thomas officials in charge of or involved in the disciplinary process are not thinking about justice, individual rights, or their obligations to provide a fair and equitable procedure in accordance with due process guarantees; rather, they are thinking what would be most expedient for them in their professional roles, as evidenced by Crouse's suggestion that the University would refund his tuition if Plaintiff would just go away.

178.    Third, these officials also focus on what would be most expedient for St. Thomas

and, in particular, avoiding publicity that could harm St. Thomas' image and brand, and hinder its efforts to attract tuition-paying students, particularly in light of earlier criticism it received related to its handling of a priest professor accused of sexual assault. The safer course for these officials is to convict all accused male students, given this history, the pressures of the "Dear Colleague Letter" that OCR has imposed on colleges, the public spotlight on both college and priestly sexual abuse epidemics, and the sustained media attention to the "It's On Us" campaign featuring Vice President Biden and popular celebrities.

179.   Fourth, St. Thomas officials are susceptible to internal and external pressures, including efforts by those who wish to change the so-called "campus rape culture" at the expense of the individual rights of accused male students. St. Thomas and its officials have plainly embraced this view, and the misandry it embodies. The resulting bias is obvious in the Sexual Misconduct Policy and Procedures.

180.   The unusual facts of Plaintiff's case led him to experience this invidious gender bias and discriminatory environment more acutely than the typical accused male student in a "he said/she said" situation. Plaintiff was accused of a violent sexual assault and immediately arrested by the St. Paul Police. Before Plaintiff was even released from jail, St. Thomas officials had banned him from his residence and restricted his ability to be on campus solely to attending class and taking finals. St. Thomas officials in charge of and involved in the disciplinary process refused to contact and interview witnesses identified by Plaintiff, blatantly ignored that Jane Doe has never stated that Plaintiff continued with any conduct she objected to, conducted a **secret** investigation, and then refused to

provide Plaintiff with the factual basis for the determination that he was a rapist.

181.    Additionally, the erroneous outcome of the hearing and purported appeal arose out of an unfair process and proceeding in which the same individual, Abigail Crouse, improperly operated in the role of both Title IX Coordinator and general counsel.

182.    In April 2011, OCR issued a "significant guidance document" commonly referred to as the "Dear Colleague Letter."  The Letter reaffirms the vitality of the 2001 Guidance and is OCR's latest interpretation of Title IX as it relates to sexual assault proceedings on campus.  As set forth in the Letter, OCR states that compliance with Title IX requires the following:

a.      A school's "Title IX coordinator [the official charged with compliance] should review the [school's] disciplinary procedures to ensure that the procedures comply with the prompt and equitable requirements of Title IX."

b.      "**Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence**, once notified that the police department has completed its gathering of evidence . . . , the school must promptly resume and complete its fact-finding for the Title IX investigation."

c.      The complainant and the accused student "**must have an equal opportunity to present relevant witnesses and other evidence**."

d.      The complainant and the accused student "must be afforded similar and timely access to any information that will be used at the hearing.  For example, a school should not conduct a pre-hearing meeting during which only the [complainant] is present and **given an opportunity to present his or her side of the story**, unless a similar meeting

takes place with the [accused student]."

e.      "**Schools must maintain documentation of all proceedings**, which may include written findings of fact, **transcripts, or audio recordings**."

f.      "[S]chools [should] provide an appeals process."

g.      "In sexual violence cases, the fact-finder and decision-maker also should have **adequate training or knowledge regarding sexual violence**."

h.      "If an investigation or hearing involves forensic evidence, that evidence should be reviewed by a **trained forensic examiner**."

183.    With regard to the Title IX coordinator, OCR has identified the position's primary responsibilities and has emphasized that "Title IX coordinators should not have other job responsibilities that may create a conflict of interest.  For example, serving as the Title IX coordinator and [as] general counsel may create a conflict of interest."  Dear Colleague Letter at 3.

184.    OCR has further explained that "[b]ecause some complaints may raise issues as to whether or how well the school has met its Title IX obligations, designating the same employee to serve both as the Title IX coordinator and the general counsel (which could include representing the school in legal claims alleging Title IX violations) poses a serious risk of conflict of interest."  Questions and Answers on Title IX and Sexual Violence at 11-12 (Apr. 29, 2014) (available at http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf).

185.    The aforementioned 2011 DCL and 2014 Questions and Answers documents are

entitled to deference under the *Auer* standard as an agency's interpretation of its own

regulations. In many respects, the 2011 DCL clarifies the meaning of the ambiguous

"prompt and equitable" requirement set forth in the Federal Register: "a recipient shall

adopt and publish grievance procedures providing for prompt and equitable resolution of

student and employee complaints alleging any action that would be prohibited by these

Title IX regulations". *Auer* deference was applied to OCR "guidance" documents by the

Court in *Biediger v. Quinnipiac University*, where the Court reasoned:

  The interpretive guidance described above, including the 1996 Clarification and
accompanying letter, the April and May 2000 OCR Letters, and the 2008 OCR Letter, are
owed substantial deference. See *Biediger*, 691 F.3d at 96-97 ("We here conclude that the
1996 Clarification, the accompanying 1996 OCR Letter, and the 2000 and 2008 OCR
Letters are likewise entitled to substantial deference under *Auer v. Robbins*, [citations
omitted], because they reflect reasonable agency interpretations of ambiguities in its own
regulation, and there is no reason to think that the agency's interpretations do not reflect
its 'fair and considered judgment on the matter in question'").

186.    As applied to John Doe, the University of St. Thomas violated Title IX by

allowing its Office of General Counsel – primarily Crouse – to assume the role of Title

IX coordinator, despite OCR's explicit statement that such an arrangement must be

avoided because it "poses a serious risk of conflict of interest." Upon information and

belief, the St. Thomas' Title IX coordinator is Nora Fitzpatrick, Senior Associate Dean

for Administration, yet the record is clear that she had no involvement in John's

proceeding at all.

187.    Instead, Crouse was directly involved in driving the resolution procedures and

appeal, advising the investigation, taking a lead role in all interactions with Doe's

attorney, in instructing the Dean of Students in how to respond to Doe's concerns about

the process, and in drafting the response to Doe's first appeal request, all of which

impermissibly usurped the functions that OCR allocated to the Title IX coordinator,

Fitzpatrick. Even if Fitzpatrick delegated those duties to another administrator, they could

not be delegated to Crouse given the conflict-of-interest with her role as Associate

General Counsel. Crouse's actions derailed the impartiality of St. Thomas' resolution

processes, driving St. Thomas to an erroneous outcome in Doe's case to avoid the specter

of zealous enforcement of Title IX lorded over colleges and universities by the Office for

Civil Rights.

188.    Crouse formed conclusions about the veracity of Jane Doe's account prior to her

first meeting with Plaintiff or Jane Doe.  Specifically, at the first scheduled meeting with

UST Dean of Students Linda Baughman-Terry, on December 16, 2015, Crouse in the

presence of Doe, Doe's father, Attorney McGraw, and most disturbingly, the decision

maker, Dean Baughman-Terry, in response to a question by Doe's father as to why the

matter would proceed as the State of Minnesota had denied prosecution, Ms. Crouse

stated that she was not at all surprised that prosecution was denied as it was a he said she

said and the State "always" denies prosecution of those cases.

189.    The statement was false and highly prejudicial when made in the presence of the

decision maker, the UST Dean of Students.

190.    Ms. Crouse made the statement in the presence of the Dean who assuredly valued

Ms. Crouse's opinion relative to legal matters.  She made the false statement lacking the

professional foundation necessary to form such a conclusion.  In point of fact, Ms.

Crouse has never investigated, prosecuted or defended an individual relative to an

allegation of sexual assault.  Based upon information and belief, she has not even been

involved in such a matter relative to a civil suit and/or a campus Title IX investigation.  If

she had, she would have never made the statement as the vast majority of sexual assault

cases that are prosecuted are cases whereby two parties provide differing accounts as to

what happened between the two of them relative to sexual interaction.

191.    The conclusion of the investigative process can only be explained by gender bias

and an improper process.  The State of Minnesota exonerated Plaintiff, but St. Thomas

did not, even with the identical exculpatory evidence.  Plaintiff, based solely on his

gender, suffered an erroneous outcome of the disciplinary process.  This unlawful

discrimination by St. Thomas in violation of Title IX proximately caused Plaintiff to

sustain substantial injury, damage, and loss, including, but not limited to: mental anguish;

severe emotional distress; injury to reputation; past and future economic loss;

deprivations of due process; loss of educational opportunities; and loss of future career

prospects.

**Count III**
**Violation of Title IX – Deliberate Indifference**

192.    Plaintiff repeats and realleges paragraphs 1 through 191 as if fully set forth herein

193.    St. Thomas and its relevant agents all had actual notice of (a) St. Thomas'

misconduct relating to Plaintiff's disciplinary proceeding; (b) the unlawful finding that

Plaintiff committed "Non-consensual sexual intercourse"; (c) the hearing and appeal

process; (d) Plaintiff's punishment of a three-semester suspension and (e), Plaintiff's own

complaint against Jane Doe for sexual harassment.

194.    Despite this actual notice of St. Thomas' misconduct and the resulting harm to

Plaintiff, its agents failed and refused to take any steps to correct the misconduct and

resulting harm to Plaintiff even though they had the authority and obligation to institute

corrective measures.  This action was clearly unreasonable in light of the known

circumstances.

195.    This failure and refusal can only be explained by gender bias against males, as set

forth above.

196.    Plaintiff, based solely on his gender, has suffered and continues to suffer the

effects of the deliberate indifference of St. Thomas and its agents.  This unlawful

discrimination by St. Thomas in violation of Title IX proximately caused Plaintiff to

sustain substantial injury, damage, and loss, including, but not limited to: mental anguish;

severe emotional distress; injury to reputation; past and future economic loss;

deprivations of due process; loss of educational opportunities; and loss of future career

prospects.

### Count IV
**Breach of Contract**

197.    Plaintiff repeats and realleges paragraphs 1 through 196 as if fully set forth herein.

198.    At all times relevant hereto, a contractual relationship existed between Plaintiff

and St. Thomas.  The St. Thomas Undergraduate Student Policy Book, which includes

the University of St. Thomas Sexual Misconduct Policy, the other related policies,

including the Policies and Procedures Manual, and promises governing situations such as

this one, the terms of which were unilaterally promulgated by St. Thomas, comprise a

contract.  Pursuant thereto, St. Thomas was required to act in accordance with the

Policies and Procedures Manual and honor those principles in its investigations of

complaints and in the process of adjudicating complaints of sexual misconduct, and in

resolving appeals brought to challenge disciplinary decisions.

199.    The promises set forth in the Policies and Procedures Manual are and were

supported by valid consideration.

200.    Plaintiff fully complied with all of his contractual obligations to St. Thomas,

including payment of tuition and compliance with enrollment procedures.

201.    Based on the above facts and circumstances, St. Thomas breached its contractual

obligations to Plaintiff by, among other things:

a.      Discriminating against Plaintiff on the basis of his gender,

b.      Failing to provide adequate policies and procedures for investigation and

adjudication of complaints of alleged sexual misconduct,

c.      Violating St. Thomas' policy against gender / sex-based discrimination by

establishing a de facto presumption, on the basis of gender stereotypes, that Plaintiff

committed sexual assault,

d.      Conducting a cursory, superficial, biased, and fundamentally unfair investigation,

hearing and appeal process,

e.      Failing to provide any sort of hearing for Plaintiff before his suspension,

f.      Preventing Plaintiff from contacting witnesses,

g.      Failing to allow Plaintiff to present a defense by denying him a hearing,

h.      Failing to allow Plaintiff to present a defense by denying him access to the

investigative report upon which it was determined he was a rapist, access guaranteed to

him by the Violence Against Women Act Section 304.

i.      Rendering an adverse decision against Plaintiff without any evidence to support it,

j.      Failing to impose a proportionate and reasonable sanction,

k.      Issuing an arbitrary and capricious determination,

l.      Misapplying St. Thomas' own consent standard as elaborated in its Policies and

Procedures Manual, and

m.     Failing to provide Plaintiff with an impartial process.

202.   As a direct, proximate, and foreseeable consequence of those breaches, Plaintiff

sustained significant damages, including, without limitation, loss of educational

opportunities, economic injuries, and other direct and consequential damages.

### Count V
**Breach of Covenant of Good Faith and Fair Dealing**

203.   Plaintiff repeats and realleges paragraphs 1 through 202 as if fully set forth herein.

204.   The contract between St. Thomas and Plaintiff imposed upon St. Thomas a duty of

good faith and fair dealing including, a duty to conduct a diligent, unbiased, and

meaningful investigation, adjudication, and appellate review according to St. Thomas'

Policies and Procedures Manual and other policies.

205.   St. Thomas breached and violated the covenant of good faith and fair dealing

implied in its agreement with Plaintiff by failing to conduct a diligent, unbiased, and

meaningful investigation, adjudication, and appellate review.

206.   St. Thomas also breached its implied covenant of good faith and fair dealing by,

among other things, engaging in the conduct in paragraph 187 above.

207.    As a direct, proximate, and foreseeable consequence of those breaches, Plaintiff

sustained significant damages, including, without limitation, loss of educational

opportunities, economic injuries, and other direct and consequential damages.

## Count VI
### Negligence

208.    Plaintiff repeats and realleges paragraphs 1 through 207 as if fully set forth herein.

209.    Having put in place a student disciplinary process, including the Policies and

Procedures Manual, St. Thomas owed a duty of care to Plaintiff and others to conduct

that process in a non-negligent manner and with due care.  The St. Thomas agents who

directed and implemented that process – including Crouse - owed Plaintiff the same duty

of care.

210.    The conduct of St. Thomas and its agents, including Crouse, fell below the

applicable standard of care and amounted to breaches of the duty of due care and

incompetence. This conduct included, but was not limited to, allowing the purportedly

fair proceeding to be directed by an individual acting in both the roles of Title IX

Coordinator and general counsel.  This tainted the process by having the role of Title IX

Coordinator filled by an individual whose sole role was not solely an obligation to

investigate and adjudicate impartially, without considering the possible adverse impact of

their actions on St. Thomas, but also to act in the best interests of St. Thomas, including

minimizing St. Thomas' exposure to sanctions by the federal government and lawsuits

from dissatisfied accusers.

211.   These breaches of the duty of due care caused Plaintiff, in fact and proximately, to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

## RELIEF REQUESTED

WHEREFORE, plaintiffs pray for judgment against defendants, jointly and severally, and ask this Court to:

1.      Issue a judgment that (a) declares the St. Thomas' investigation, prosecution, and adjudication of the charge against Plaintiff to be contrary to the St. Thomas' contractual and other obligations, its own rules and regulations, and contrary to law; (b) declares St. Thomas' student disciplinary process, including the Sexual Misconduct Policy and Procedures, as written, as implemented, and as applied to Plaintiff, to be in violation of Title IX, including its due process requirements; (c) requires St. Thomas to expunge the entire disciplinary proceeding from its records; (d) declares St. Thomas' conduct to be wrongful, willful, intentional, and reckless; (e) prohibits St. Thomas from referencing Plaintiff's disciplinary proceeding in the event of any third-party inquiry; and (f) declares that upon any third-party inquiry, Plaintiff may reply in the negative as to any question as to whether he has been accused of sexual misconduct or as to any similar question.

2.      Issue a permanent injunction that directs St. Thomas to comply with Title IX, including its due process requirements;

3.      Award plaintiff compensatory damages in an amount to be determined at trial, but not less than $75,000.00 for mental anguish, severe emotional distress, serious mental injury, injury to reputation, past and future economic loss, deprivations of due process, loss of educational opportunities, loss of future career prospects, and other injuries proximately caused by the wrongful conduct of defendants;

4.      Award plaintiff his attorney's fees, disbursements, and costs pursuant to the provisions of 42 U.S.C. § 1988(b) (relating to Title IX); or pursuant to any other statute or common law doctrine providing for the award of attorney's fees, disbursements, and/or costs;

5.      Award prejudgment interest; and

6.      Grant such other and further relief as the Court may deem just and proper.

### Demand For Jury Trial

Plaintiffs demand a trial by jury of all claims so triable.

Dated: 5/20/16

John Doe
John Doe

Dated: May 19, 2016                    **MCGRAW LAW FIRM, P.A.**

/s/Beau D. McGraw

Beau D. McGraw, I.D. No.: 31190X
Attorney for Plaintiff
10390 39th Street North, Suite 3
Lake Elmo, MN 55042
Telephone: (651) 209-3200
beau@mcgrawlawfirm.com