# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| JOHN DOE, | Civil No.  16-1127 (JRT/KMM) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND** |
| | **ORDER ON DEFENDANT'S** |
| UNIVERSITY OF ST. THOMAS, | **MOTION TO DISMISS** |
| Defendant. | |

Beau D. McGraw, **MCGRAW LAW FIRM, PA**, 10390 39th Street North, Lake Elmo, MN  55042, for plaintiff.

David A. Schooler and Ellen A. Brinkman, **BRIGGS & MORGAN, PA**, 80 South Eighth Street, Suite 2200, Minneapolis, MN   55402, for defendant.

This case arises from alleged sexual misconduct that occurred on Defendant University of St. Thomas's ("UST") campus in December 2015.   Even though the Ramsey County Attorney decided not to prosecute Plaintiff John Doe, UST initiated disciplinary proceeding and suspended Doe.  Doe filed an Amended Complaint regarding the disciplinary process, alleging six causes of action.   UST moved to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).   For the reasons set forth below, the Court will grant UST's motion to dismiss Counts I through V, but deny UST's motion to dismiss Count VI.

## BACKGROUND

### I.   UST SEXUAL MISCONDUCT POLICY

#### A.   Prohibited Conduct

In December 2015, UST's Sexual Misconduct Policy (the "Policy") prohibited students from engaging in "[a]ll forms of sexual misconduct."  (Am. Compl., Ex. 1 at 2, May 20, 2016, Docket No. 34.)  Students who "engaged in sexual misconduct . . . [were] subject to disciplinary action."  (*Id.* at 3.)  The Policy defined "sexual misconduct" to include "non-consensual sexual intercourse."  (*Id.*)  The Policy also defined "consent" to engage in sexual acts as "conduct or words that indicate[d] a person freely agree[d]."  (*Id.*)  In defining "consent," the Policy explicitly stated "[c]onsent to one form of sexual activity [did] not imply consent to other forms of sexual activity" and "[s]ilence or failing to resist a sexual act [did] not constitute consent."  (*Id.*)

#### B.   Response and Resolution Process

The Policy included a process to address allegations of sexual misconduct.  (*Id.* at 7-8, 10-17.)  The Policy set forth guidelines UST would follow when investigating allegations of sexual misconduct, but also stated the "provisions [were] intended to be flexible so as to allow UST to meet its legal obligations while fulfilling its educational mission."  (*Id.* at 10.)  The Policy permitted "[t]he Title IX Coordinator [to] authorize departures from the[] provisions when warranted by the circumstances."  (*Id.*)

UST applied its formal sexual-misconduct resolution process when a complaint alleged nonconsensual intercourse.  (*Id.* at 13.)  Under this process, the "Response

Manager" – the Dean of Students – would first take interim actions to protect the parties and assign a "Process Advisor" to "explain the response and resolution process and provide information about available resources." (*Id.* at 10-12.)   Next, the Response Manager would assign one or more "Factfinders" to "conduct[] an investigation into the facts of the incident" and notify both the complainant and the respondent. (*Id.* at 14.) Following the notices, the Process Advisor would hold a meeting with the respondent to review the allegations, discuss available resources, review UST's Policy, and answer any questions. (*Id.* at 14-15.)   The Policy also indicated UST would provide the respondent a written summary of all allegations and defenses during the factfinding process. (*Id.* at 14.)

With regard to the Factfinders' investigation, the Policy stated the Factfinders would conduct interviews, offer written summaries, and afford both the complainant and the respondent an opportunity to respond. (*Id.*)   As part of the response, both the complainant and the respondent could identify witnesses, documents, and other evidence; offer questions to ask witnesses; and supply responsive statements. (*Id.*)

After completing the investigation, the Factfinders would "weigh the evidence and determine whether it [was] more likely than not (using a 'preponderance of the evidence' standard) that the [r]espondent [was] responsible for the misconduct alleged." (*Id.* at 15.) If the Factfinders found the respondent responsible, a determination would be made that the Policy had been "violated," a report would be prepared, and the Response Manager would determine appropriate sanctions. (*Id.*)   Finally, UST would provide a written

notification of the Factfinders' decision and give both the complainant and the respondent an opportunity to appeal.  (*Id.* at 15-16.)

## II.   INCIDENT

On December 11, 2015, Doe – a freshman at UST – attended an on-campus party. (Am. Compl. ¶¶ 1, 30.)  Doe, the alleged female victim ("Jane Doe"), and others left to attend an off-campus party.  (*Id.* ¶¶ 36-37.)  Shortly thereafter, Jane Doe indicated she wanted to go back to her dorm room and Doe offered to walk with Jane Doe.  (*Id.* ¶ 41.)

Doe and Jane Doe engaged in consensual kissing in the dorm's common room. (*Id.* ¶ 46.)  The pair eventually ended up in the bathroom connected to Jane Doe's dorm room.  (*Id.* ¶¶ 52-55, 93-95.)  Doe and Jane Doe gave varying accounts regarding how they ended up in the bathroom.  (*Id.*)  While in the bathroom, Doe digitally penetrated Jane Doe.  (*Id.* ¶ 62.)  Doe and Jane Doe both agreed Jane Doe's vagina bled after the digital penetration.  (*Id.* ¶¶ 68-69.)  Jane Doe also alleged in two police reports that she did not consent to the digital penetration.  (*Id.* ¶¶ 95-97, 107-08, 112.)

Doe does not dispute that Jane Doe did not verbally consent to the digital penetration.  Doe alleges, however, that Jane Doe did not object to removal of her pants and that Jane Doe stroked his penis, which Doe interpreted as consent to the digital penetration.  (*Id.* ¶¶ 59-62.)

## III.   INVESTIGATIONS

Jane Doe reported the incident to UST on December 13, 2015, and the St. Paul Police Department a day later.  (*Id.*, Ex. 2.)  Police arrested Doe on December 14, 2015,

but the Ramsey County Attorney's Office decided not to prosecute.  (*Id.*; Am. Compl., Ex. 5.)

UST also investigated the incident.  Doe received a written notice from the Dean of Students informing Doe that Jane Doe made a complaint.  (Am. Compl., Ex. 6.)  The letter provided notice of interim actions UST would take, including (1) a no contact order applicable to both parties; (2) removal of Doe from his on-campus residence during the investigation; and (3) a prohibition against Doe being on campus except for specified purposes, such as going to class.  (*Id.*)  Doe received a second letter from the Dean of Students on December 15, 2015, advising Doe about the Policy, identifying the Factfinders, and informing Doe about his rights.  (Am. Compl., Ex. 7.)

UST held a meeting with Doe and his attorney to explain Jane Doe's allegations and the process UST would follow.  (Am. Compl. ¶ 130; *id.*, Ex. 4.)  The Factfinders investigated the incident and interviewed several witnesses, including Doe, Jane Doe, and witnesses identified by Doe.  (Am. Compl. ¶¶ 132-42; *id.*, Ex. 8.)  Doe also provided additional evidence, which the Factfinders reviewed and considered as part of the investigation.  (Am. Compl., Ex. 8.)  When the Factfinders concluded the investigation, the Factfinders informed Doe he had been found responsible for non-consensual sexual intercourse and would be suspended from UST until fall semester 2017, pending his right to appeal.  (Am. Compl. ¶¶ 144, 153.)

Doe appealed.  (*Id.*, Exs. 11-12.)  A five-member board and an Appeal Officer considered the appeal and found no grounds to change the determination.  (*Id.* ¶¶ 154-55.)  The Appeal Officer ultimately upheld the original determination of the Factfinders,

but adjusted the sanction – extending the suspension period until spring semester 2018. (Am. Compl. ¶¶ 154-55; *id.*, Ex. 12.)

## IV.     PROCEDURAL HISTORY

On May 20, 2016, Doe filed an Amended Complaint alleging UST violated Doe's rights through its application of the Policy.  The Amended Complaint alleged six causes of action:  (1) Declaratory Judgment under Title IX (Count I); (2) Violation of Title IX – Erroneous Outcome (Count II); (3) Violation of Title IX – Deliberate Indifference (Count III); (4) Breach of Contract (Count IV); (5) Breach of the Covenant of Good Faith and Fair Dealing (Count V); and (6) Negligence (Count VI). (*Id.* ¶¶ 158-211.)  On June 6, 2016, UST filed a motion to dismiss the Amended Complaint, in its entirety, asserting Doe failed to state a claim upon which relief can be granted.

## DISCUSSION

## I.     STANDARD OF REVIEW

In reviewing a motion to dismiss brought under Rule 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a claim for "relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  To survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Although the Court accepts the complaint's factual allegations as true, it is "not bound to accept as true a

legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility,'" and therefore must be dismissed. *Id.* (quoting *Twombly*, 550 U.S. at 557).

## II.   DECLARATORY JUDGMENT (COUNT I)

UST first argues Doe's claim seeking declaratory judgment fails as a matter of law. UST asserts Doe's claim stems from UST's alleged violation of Title IX's regulatory requirements and that, under Supreme Court precedent, there is no private right of action for enforcement of regulatory requirements. Doe responds that the Supreme Court has never addressed the precise issue in this case – whether there is a private right of action when a student is wrongfully accused of sexual assault. Doe posits that because the law has, over time, expanded the implied private right of action for Title IX claims, the Supreme Court would find an implied private right of action in this case.

In *Gebser v. Lago Vista Independent School District*, the Supreme Court noted that it had "never held . . . that the implied private right of action under Title IX allows recovery in damages for violation of . . . administrative requirements." 524 U.S. 274, 292 (1998). The Court specifically found that a school's "failure to promulgate a grievance procedure [did] not itself constitute 'discrimination' under Title IX" and only "the

Department of Education could enforce [a regulatory] requirement administratively." *Id.* Numerous district courts have interpreted *Gebser* to mean there is no private right of action to enforce grievance procedures and other regulations under Title IX. *See, e.g.*, *Moore v. Regents of the Univ. of Cal.*, No. 15-5779, 2016 WL 2961984, at *8 (N.D. Cal. May 23, 2016); *Melton v. Alaska Career Coll., Inc.*, No. 15-209, 2016 WL 1312738, at *4 (D. Alaska Apr. 4, 2016); *Doe v. Case W. Reserve Univ.*, No. 14-2044, 2015 WL 5522001, at *4 (N.D. Ohio Sept. 16, 2015).

Here, Doe's declaratory judgment claim relies solely on violations of regulations promulgated under Title IX – requiring the adoption of certain grievance procedures. (Am. Compl. ¶¶ 161-65.)  Under *Gebser*, there is no private right of action to enforce the regulatory requirements under Title IX because failure to promulgate a grievance process is not itself discrimination.  524 U.S. at 292.  Because there is no private right of action, the Declaratory Judgment Act cannot be used as an independent cause of action and, therefore, Doe's claim fails as a matter of law.  *See Schilling v. Rogers*, 363 U.S. 666, 679 (1960).  The Court will, therefore, grant UST's motion to dismiss Count I.

## III.  TITLE IX – ERRONEOUS OUTCOME AND DELIBERATE INDIFFERENCE (COUNTS II & III)

UST next alleges Doe's Title IX claims based on erroneous outcome and deliberate indifference should be dismissed because Doe failed to allege specific facts giving rise to a plausible inference of gender bias.

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

- 8 -

discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  As a general rule, Title IX is not an invitation for courts to second-guess disciplinary decisions of colleges or universities.  *See Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648-49 (1999).  And Title IX should be construed to give "[s]chool administrators . . . the flexibility they require" to initiate a reasonable disciplinary response.  *Id.*

To allege a Title IX claim based on a disciplinary proceeding under either erroneous outcome[1] or deliberate indifference[2] theory, Doe must plausibly allege

---

[1] A plaintiff may assert a claim under Title IX based upon an erroneous outcome theory when "the plaintiff 'attack[s the] university disciplinary proceeding on grounds of gender bias' by arguing that the plaintiff 'was innocent and wrongly found to have committed an offense.'" *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 777-78 (S.D. Ohio 2015) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)).  To allege a Title IX claim based on erroneous outcome, Doe must plead: "(1) facts sufficient to cast doubt as to the accuracy of the outcome of the disciplinary proceeding and (2) a causal connection between the flawed outcome and gender bias." *Id.*.

[2] In general, a plaintiff alleges a Title IX deliberate indifference claim by "demonstrat[ing] . . . an official of the institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct" directed at the plaintiff. *Mallory v. Ohio Univ.*, 76 F. App'x 634, 638 (6th Cir. 2003).  To satisfy this standard, "the plaintiff must be able to identify an 'appropriate person' under Title IX, i.e., a school district official with the authority to take corrective measures in response to actual notice of sexual harassment." *Doe v. Sch. Bd. of Broward Cty.*, 604 F.3d 1248, 1254 (11th Cir. 2010).  Further, a plaintiff must meet the high bar of alleging an institution's response to the alleged misconduct was "clearly unreasonable in light of the known circumstances." *Doe v. Univ. of the South*, 687 F. Supp. 2d at 757 (quoting *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 446 (6th Cir. 2009)).

But it is an open question whether the Title IX deliberate indifference standard applies to claims related to alleged gender discrimination in a university's disciplinary proceedings. *Compare Doe v. Baum*, No. 16-13174, 2017 WL 57241, at *26 (E.D. Mich. Jan. 5, 2017), *and Marshall v. Ohio Univ.*, No. 15-775, 2015 WL 7254213, at *8 (S.D. Ohio Nov. 17, 2015), *and Sahm*, 110 F. Supp. 3d at 778 n.1, *with Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 751 (S.D. Ohio 2014), *and Shank v. Carleton Coll.*, No. 16-1154, 2017 WL 80249, at *5 (D. Minn. Jan. 9, 2017).

(Footnote continued on next page.)

circumstances suggesting gender bias motivated UST's disciplinary proceeding. *See Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994) (under an erroneous outcome theory "[a] plaintiff must . . . allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding"); *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 757-58 (E.D. Tenn. 2009) (under a deliberate indifference theory a plaintiff must allege the "University's alleged actions constituted sexual harassment").

Doe points to several allegations in the Amended Complaint to show Doe alleged sufficient facts regarding gender bias to survive a motion to dismiss. Doe highlights the following allegations: (1) a UST official stated, in the presence of the "ultimate decision maker," that she was not surprised Ramsey County declined to prosecute Doe because Ramsey County "always" declines to prosecute "he said she said" cases, (Am. Compl. ¶ 130); (2) a UST official stated Doe could make things easier for everyone if he withdrew from UST and received a tuition refund, (*id.* ¶ 145); (3) UST questioned medical professionals differently regarding Doe and Jane Doe, (*id.* ¶¶ 149-50); (4) UST challenged Jane Doe's statements less vigorously than Doe's statements, (*id.* ¶ 151); (5) UST's general counsel improperly filled the role of Title IX Coordinator, (*id.* ¶¶ 181, 183-84); (6) UST only applied the Policy to male students accused by female students,

---

(Footnote continued.)

Because the Court finds Doe did not allege a plausible claim of gender bias to survive a motion to dismiss on any Title IX claim, the Court does not decide whether a deliberate indifference claim is appropriate in this circumstance. *See Mallory*, 76 F. App'x at 638-39 (assuming without deciding that a Title IX deliberate indifference claim can be alleged to challenge a disciplinary proceeding, but ultimately finding the plaintiff failed to state a claim).

(*id.* ¶ 175); and (7) the Federal government pushed colleges and universities to punish male students accused of sexual assault, (*id.* ¶¶ 10-14, 175-76).

The Court finds Doe's allegations are insufficient to support a plausible claim for relief.[3]  Many of Doe's allegations have nothing to do with gender.  Specifically, comments about "he said she said" cases could relate to the alleged perpetrator being either a man or a woman and comments about Doe withdrawing from school are not gender-based.

Regarding UST's alleged unbalanced questioning of Jane Doe (the complainant-victim) and Doe (the respondent-perpetrator), numerous courts have held that "[e]ven if [a] [u]niversity treated [a] female student more favorably than the [p]laintiff, during the

---

[3] Doe cites a number of cases to argue his allegations are more than conclusory and show gender bias.  Doe's cases are distinguishable from the Amended Complaint.  In *Doe v. Washington & Lee University*, the plaintiff alleged the Title IX officer endorsed an article discussing sexual misconduct in gendered terms.  No. 14-52, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015).  The court in *Wells v. Xavier University* found the plaintiff sufficiently alleged a "pattern of decision-making" improperly based on gender.  7 F. Supp. 3d 746, 751 (S.D. Ohio 2014).  And the court in *Doe v. Salisbury University* found (on a "close call") that gender bias was alleged when the plaintiff asserted the University possessed communications evidencing discriminatory intent.  123 F. Supp. 3d 748, 766, 768 (D. Md. 2015).

Here, in contrast, Doe does not point to the endorsement of gender-based articles by school officials or the existence of any UST communication that would show UST disciplined Doe because of his gender.  Further, while a pattern of disparate treatment of men can in some instances show gender bias, a court "cannot plausibly infer . . . that a higher rate of sexual assaults committed by men against women, or filed by women against men, indicates discriminatory treatment of males accused of sexual assault."  *Regents of the Univ. of Cal.*, 2016 WL 5515711, at *5; *see also Doe v. Cummins*, No. 16-3334, 2016 WL 7093996, at *14 (6th Cir. Dec. 6, 2016).  Thus, Doe's allegations regarding UST's use of the Policy only against men does not show gender bias in the absence of evidence women are treated differently when accused of sexual assault.  *Doe v. Univ. of Mass.-Amherst*, No. 14-30143, 2015 WL 4306521, at *9 (D. Mass. July 14, 2015) ("Plaintiff has not alleged any facts indicating male and female students accused of sexual harassment are treated differently by the university in terms of the way complaints are pursued or discipline is imposed.").

disciplinary process, 'the mere fact that [p]laintiff is male and [the alleged victim] is female does not suggest that the disparate treatment was because of [p]laintiff's sex.'" *Salau v. Denton*, 139 F. Supp. 3d 989, 999 (W.D. Mo. 2015) (quoting *Doe v. Columbia Univ.*, 101 F. Supp. 3d 356, 371 (S.D.N.Y. 2015)); *see also Austin v. Univ. of Or.*, Nos. 15-2257, 16-647, 2016 WL 4708540, at *8 (D. Or. Sept. 8, 2016). And "[d]emonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students." *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015).

With respect to Doe's claims about the Title IX Coordinator, Doe cannot show gender bias simply by alleging a decision-maker was involved in multiple roles. *Id.* And, accepting as true that the Policy has only been applied to men, numerous courts have held a court "cannot plausibly infer . . . a higher rate of sexual assaults committed by men against women, or filed by women against men, indicates discriminatory treatment of males accused of sexual assault." *Doe v. Regents of the Univ. of Cal.*, No. 15-2478, 2016 WL 5515711, at *5 (C.D. Cal. 2016); *see also Doe v. Cummins*, No. 16-3334, 2016 WL 7093996, at *14 (6th Cir. Dec. 6, 2016).

This leaves Doe's allegation that gender bias existed in the disciplinary process because the federal government pressured colleges and universities to punish male students accused of sexual assault. (*Id.* ¶¶ 10-14, 175-76). Some courts have allowed a Title IX discrimination claim to proceed even where the only evidence of gender bias was pressure from the federal government. *See Regents of the Univ. of Cal.*, 2016 WL

5515711, at *5 (collecting cases).   But this Court joins the majority of federal courts in finding a general reference to federal pressure, by itself, is insufficient to show gender bias.   *Cummins*, 2016 WL 7093996, at *13 (noting reference to the Department of Education's "Dear Colleague Letter" as evidence of federal pressure was "conclusory" and did not create a plausible claim); *Doe v. Baum*, No. 16-13174, 2017 WL 57241, at *24 (E.D. Mich. Jan. 5, 2017) (finding two-year-old news events did not supply plausible support to show public pressure).

This finding is consistent with the Second Circuit's recent decision in *Doe v. Columbia University*, 831 F.3d 46, 57 (2d Cir. 2016).   There, the Second Circuit reversed the district court holding the following allegations were sufficient to show gender bias:

> [T]he Complaint allege[d] that during the period preceding the disciplinary hearing, there was substantial criticism of the University, both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students. It allege[d] further that the University's administration was cognizant of, and sensitive to, these criticisms, to the point that the President called a University-wide open meeting with the Dean to discuss the issue.

*Id.*   The Second Circuit concluded that "[a]gainst this factual background, it [was] entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault."[4]   *Id.*

---

[4] In *Columbia University*, the Second Circuit also appeared to apply a more lenient standard of review.   831 F.3d at 53-56.   The Sixth Circuit recently declined to apply a more

(Footnote continued on next page.)

In contrast to *Columbia University*, while Doe alleged UST faced general federal pressure to "treat male students accused of sexual misconduct with a presumption of guilt," (Am. Compl. ¶ 11), Doe did not allege any targeted stress UST faced from government institutions or the public at large for UST's handling of previous sexual misconduct complaints on campus. Thus, unlike *Columbia University*, Doe does not point to a specific stressor that would cause UST to "favor the accusing female over the accused male" because of the accused male's gender. 831 F.3d at 57; *see also Cummins*, 2016 WL 7093996, at *13 (noting reference to the Department of Education's "Dear Colleague Letter" as evidence of federal pressure was "conclusory" and did not create a plausible claim); *Doe v. Washington & Lee Univ.*, No. 14-52, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015) (pointing to both governmental pressure and recent actions on campus as evidence of discrimination in the disciplinary procedure). The Court, therefore, finds Doe's allegations of federal pressure to prosecute male students of sexual assault are insufficient to show gender bias.

Because Doe's allegations are insufficient to show UST's disciplinary process was motivated by gender bias, the Court will grant UST's motion to dismiss Count II and Count III.

---

(Footnote continued.)

lenient standard, *see Cummins*, 2016 WL 7093996, at *5, 12-14, and at least two district courts have elected not to apply the standard, *see Austin*, 2016 WL 4708540, at *9; *Collick v. William Paterson Univ.*, No. 16-471, 2016 WL 6824374, at *10 (D.N.J. Nov. 17, 2016). The Eighth Circuit has not weighed in on this issue. Here, the Court applies the standard used by the Sixth Circuit in *Cummins* and the majority of federal courts. But even under the arguably more lenient standard set forth in *Columbia University*, the Court finds Doe failed to allege gender bias.

## IV.    BREACH OF CONTRACT (COUNT IV)

UST next argues Doe's breach of contract claim should be dismissed because Doe failed to allege the existence of a contractual relationship.   UST asserts contractual obligations between students and their schools generally do not arise based upon a student handbook.    Doe responds that his breach of contract claim should not be dismissed because UST made specific promises to follow the Policy in several letters and, by failing to comply with those specific promises, UST breached its contract.

In Minnesota, "[e]lements of the law of contracts have been applied to the student-university relationship, but rigid importation of contractual doctrine has been rejected." *Abbariao v. Hamline Univ. Sch. of Law*, 258 N.W.2d 108, 113 (Minn. 1977).  "Minnesota courts [have been] generally reluctant to find contractual obligations between students and their schools based upon student handbooks."  *Rollins v. Cardinal Stritch Univ.*, 626 N.W.2d 464, 470 (Minn. Ct. App. 2001); *see also Zellman ex rel. M.Z. v. Indep. Sch. Dist. No. 2758*, 594 N.W.2d 216, 220 (Minn. Ct. App. 1999) (holding "a student handbook provided by a public school district does not form a unilateral contract between the student and the school district").  For example, the court in *Ross v. University of Minnesota* held due process procedures used by the University of Minnesota when a medical resident failed to meet academic requirements did "not constitute a unilateral contract."  439 N.W.2d 28, 34 (Minn. Ct. App. 1989).  The Court further held that, even if a unilateral contract existed, a material breach did not occur so long as the University of Minnesota "substantially complied" with the procedure by providing "basic due

process protections." *Id.*  Similarly, the *Rollins* court held a student handbook at a private university "did not constitute a contract between the school and the student that required strict compliance with every provision."   626 N.W.2d at 471.   Further, a breach of contract claim did not exist because the record showed the school substantially complied with the handbook's procedures by providing a hearing and an appeal.  *Id.*

Here, as pointed out by UST, Doe's Amended Complaint does not point to any specific provisions of the Policy that UST breached.  In fact, many of Doe's allegations do not arise from specific terms in the Policy.  For example, Doe contends UST breached its contract by preventing an independent investigation, refusing to provide all materials related to the investigation, and denying him access to the identities of individuals interviewed as part of the investigation.  (Am. Compl. ¶¶ 121, 145-46, 201(f), (h).)  But the Policy did not mandate any of those actions.  In fact, the Policy only required "a written notification" regarding the outcome of the investigation and explicitly stated that "UST [was] limited in the information it [could] share in providing [a] notice of outcome."  (*Id.*, Ex. 1 at 15.)  Further, the Policy provided that the respondent could "**identify**" witnesses, documentation, and other evidence for the Factfinders to review, but the Policy did not speak to whether a respondent could conduct an independent investigation.  (*See id.* at 14 (emphasis added).)

Doe attempts to circumvent the Amended Complaint's failure to identify a breach of specific provisions in the Policy by arguing UST made specific promises to Doe in letters dated December 14, 2015, December 15, 2015, and February 10, 2016.  (*See* Am. Compl., Exs. 6 & 7.)  Doe asserts that these letters amount to specific promises made to

Doe that UST would adhere to the Policy in its investigation.  Doe then argues the Amended Complaint stated a claim for relief because UST did not provide a written summary of all allegations and defenses or allow Doe time to respond.

There is no evidence in the record that the Factfinders provided "a written summary of all allegations and defenses" during the factfinding process – as required by the Policy.  (*See id.*, Ex. 1 at 14.)  But, in the Amended Complaint, Doe does not allege a breach of contract for UST's failure to comply with this provision.  (*See* Am. Compl. ¶¶ 197-202.)  Further, the Amended Complaint and attached exhibits evidence that UST provided Doe an opportunity to respond to the allegations and identify witnesses, documentation, and other evidence.  (*See id.* ¶¶ 135-38; *id.*, Exs. 8-9.)[5]

For these reasons, Doe failed to allege a breach of contract claim under Minnesota law.  Not only is it unlikely UST formed a unilateral contract under Minnesota law, *see Rollins*, 626 N.W.2d at 471, Doe did not allege any breaches of the Policy in the Amended Complaint.  Further, even if UST formed a unilateral contract with Doe by sending several letters, the Policy provided that the "provisions [were] intended to be flexible" and that the "Title IX Coordinator [could] authorize departures from [the] provisions when warranted by the circumstances."  (Am. Compl., Ex. 1 at 10.)  To the extent UST failed to provide Doe a "written summary of all allegations and defenses,"

---

[5] Plaintiff also implies that UST failed to provide notice of the outcome of the investigation in writing.  But the notice provided by UST is attached to the Amended Complaint as Exhibit 10.

the remainder of UST's response substantially complied with the Policy.  *See, e.g.*, *Ross*, 439 N.W.2d at 34.

Therefore, the Court will grant UST's motion to dismiss Count IV.

## V.       DUTY OF GOOD FAITH AND FAIR DEALING (COUNT V)

UST next argues Doe failed to allege a plausible claim for breach of the duty of good faith and fair dealing because Doe failed to state a claim for breach of contract. "Minnesota does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing without an underlying breach of contract claim." *i-Sys., Inc. v. Softwares, Inc.*, No. 02-1951, 2004 WL 742082, at *12 (D. Minn. Mar. 29, 2004); (*see also* Am. Compl. ¶ 204 (basing Doe's breach of the duty of good faith and fair dealing claim on UST's breach of contract)).  Because the Court finds Doe failed to allege a breach of contract, the Court will also dismiss Count V.

## VI.      NEGLIGENCE (COUNT VI)

UST finally argues Doe failed to allege a plausible negligence claim.   In Minnesota, to survive a motion to dismiss, Doe must allege:  (1) UST owed Doe a duty of care; (2) UST breached that duty of care; (3) Doe was injured; and (4) UST's breach of the duty of care was the proximate cause of Doe's injury.  *Glorvigen v. Cirrus Design Corp.*, 816 N.W.2d 572, 585 (Minn. 2012).

UST argues Doe failed to allege a duty of care because Minnesota law does not recognize a claim for negligent breach of contract.  *See Lesmeister v. Dilly*, 330 N.W.2d 95, 102 (Minn. 1983).  Doe concedes that Minnesota law does not recognize a claim for

negligent breach of contract, but argues the Amended Complaint does not limit his negligence claim to the language of the Policy. (*See* Am. Compl. ¶ 209.)  Citing cases related to arbitrary expulsion of students, *see Abbariao*, 258 N.W.2d at 112-13; *Rollins*, 626 N.W.2d at 470, Doe argues UST owed him a duty of care to conduct its disciplinary proceeding in a non-negligent manner.

"Minnesota law follows the general common law rule that a person does not owe a duty of care to another – e.g., to aid, protect, or warn that person – if the harm is caused by a third party's conduct." *Doe 169 v. Brandon*, 845 N.W.2d 174, 177-78 (Minn. 2014). But exceptions to this rule exists "(1) where there was a special relationship between the defendant and the plaintiff; (2) where the defendant's own conduct created a foreseeable risk of harm to the plaintiff; [or] (3) where the defendant voluntarily assumed a duty of care toward the plaintiff." *Shank v. Carleton Coll.*, No. 16-1154, 2017 WL 80249, at *6 (D. Minn. Jan. 9, 2017); *see also Doe v. Univ. of the South*, No. 9-62, 2011 WL 1258104, at *20–21 (E.D. Tenn. Mar. 31, 2011) (applying the "foreseeable risk of harm" duty to a university's implementation of a disciplinary policy). Whether such a duty arises "requires a careful consideration of the particular facts of the case." *Shank*, 2017 WL 80249, at *6.

While a close case, construing the Amended Complaint in the light most favorable to Doe, Doe pled sufficient facts to allege UST owed him a duty of care.  Even though the cases cited by Doe are not directly on point, *Abbariao* and *Rollins* provide that there are some instances where a special relationship between a student and a college or university creates a duty of care.  *Abbariao*, 258 N.W.2d at 112-13 (noting that at

common law a university had a duty not to "arbitrarily expel a student" (citing *Gleason v. Univ. of Minn.*, 116 N.W. 650 (1908))); *Rollins*, 626 N.W.2d at 470 ("[W]e hold that common law imposes a duty on the part of private universities not to expel students in an arbitrary manner."). Further, Doe alleged that UST's creation of a "disciplinary process" created a foreseeable risk of harm to a student if UST officials conducted the disciplinary process in a negligent manner. (Am. Compl. ¶¶ 209-10.) Therefore, while the Court is skeptical that the facts underlying this case will ultimately establish a duty of care, a factual record must be developed to assess whether a duty exists. *See Shank*, 2017 WL 80249, at *6.

UST also argues that, to the extent Doe alleged a duty of care, Doe failed to plead facts giving rise to a plausible inference that UST breached any duty. But the Amended Complaint sets forth allegations that UST officials made a plethora of errors during the disciplinary process that amounted to a breach of UST's alleged duty of care. (*See* Am. Compl. ¶¶ 208, 210, *see also id.* ¶¶ 131, 145-46, 149-51, 163-64, 173, 186-90, 201(d)-(k).) Further, the Court finds it difficult to assess whether UST breached any alleged duty of care without UST's report or other documents underlying UST's disciplinary decision. Because Doe has not had access to this information and, therefore, the Court must rely on Doe's characterization of the proceedings, the Amended Complaint alleged enough facts to give rise to a plausible inference that UST breached a duty of care.

Therefore, the Court finds Doe pled sufficient facts to support a plausible negligence claim and the Court will deny UST's motion to dismiss Count VI.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that the University of St. Thomas's Motion to Dismiss [Docket No. 43] is **GRANTED in part** and **DENIED in part** as follows:

1.      The motion is **GRANTED** as to Counts, I, II, III, IV, and V.

    a.      Plaintiff's claims for Declaratory Judgment (**Count I**), Breach of Contract (**Count IV**), and Breach of the Covenant of Good Faith and Fair Dealing (**Count V**) are dismissed **with prejudice**.[6]

    b.      Plaintiff's claims for Violation of Title IX – Erroneous Outcome (**Count II**) and Violation of Title IX – Deliberate Indifference (**Count III**) are dismissed **without prejudice**.

2.      The motion is **DENIED** with respect to the negligence claims found in Count VI of the Amended Complaint.

DATED:  March 1, 2017
at Minneapolis, Minnesota.

                s/ John R. Tunheim
                    JOHN R. TUNHEIM
                      Chief Judge
           United States District Court

---

[6] The Court finds that, for Counts I, IV, and V, it "is unable to conceive of any set of facts under which [Doe] would be entitled to relief." *Hamilton-Warwick v. U.S. Bancorp*, No. 15-2730, 2016 WL 6916798, at *2 (D. Minn. Nov. 22, 2016) (quoting *Bounds v. Hanneman*, No. 13–266, 2014 WL 1303715, at *14 (D. Minn. Mar. 31, 2014)).