# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| John Doe, | Court File No.  16-cv-1127 (JRT/DTS) |
| Plaintiff, | |
| v. | **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| University of St. Thomas, | |
| Defendant. | |

## <u>INTRODUCTION</u>

The university would have you believe that because it is a private faith-based school, it would do no harm and should be left to handle its own issues.  That reasoning, unfortunately, was followed for many years.  Harsh stories have come out for the past ten (10) years of neglect, bias, and mishandling of cases such as this.  The U.S. Justice system and the rule of law has a role to play.  It has a time-tested, proven system of deeds and balances.  It is staffed by people who do their jobs on a daily basis.  They are independent, fair, and see seek the truth.  Despite Defendant's assertions, it is clear Defendant owed Plaintiff a duty of care in this matter and there is more than sufficient evidence of Defendant's breach of that duty to get this matter to a jury.  Plaintiff respectfully requests that the Court deny Defendant's motion and allow a jury of Plaintiff's peers to determine whether he was treated fairly in this matter.

## STATEMENT OF FACTS

Plaintiff was accused of sexual misconduct, in violation of St. Thomas' Sexual Misconduct Policy and Procedures, as the result of a sexual encounter which took place on the night of December 11th and the morning of December 12, 2015.  As a result, Plaintiff's access to campus, including his ability to reside on campus was revoked and thereafter severely limited.  Despite the fact that the Ramsey County Attorney's Office declined to prosecute Plaintiff, after an independent investigation of its own, UST determined that Plaintiff was responsible for non-consensual sexual intercourse and suspended Plaintiff from UST until the spring semester of 2018.  Plaintiff subsequently initiated a lawsuit seeking a declaratory judgment, injunctive relief, and damages based upon his discriminatory treatment by UST through its flawed investigation into the events of December 11-12, 2016.

**St. Thomas' Sexual Misconduct Policies and Procedures**.

St. Thomas' "Sexual Misconduct Policy and Procedures" ("Policies and Procedures Manual") sets forth the school's policies and procedures for investigating and adjudicating allegations of sexual misconduct.  (See McGraw Dec. Ex. 1 – UST Sexual Misconduct Policy and Procedures).  St. Thomas represented in the Policies and Procedures Manual that its policies and procedures concerning sexual assault complied with the requirements of Title IX.  The following terms are summarized from the Policies and Procedures Manual.

In the June 2015 Policies and Procedural Manual "Consent" is defined as:

> … conduct or words that indicate a person freely agrees to engage in a sexual act at the time of the act, subject to the following:  * In order to give consent, one must be of legal age.  * Consent to one form of sexual activity does not

2

imply consent to other forms of sexual activity.   *Silence or failing to resist
a sexual act does not constitute consent.   *A current or previous relationship
does not imply consent.   *A person who is asleep, unconscious or
substantially impaired by drugs, alcohol, disability or other means, or who
lacks full knowledge or information of what is happening, cannot consent to
a sexual act.  This is true regardless of whether the person voluntarily or
involuntarily consumed drugs or alcohol.   * The use of alcohol or other
drugs does not excuse behavior that violates this policy.   *Corroboration of
a victim's testimony is not required to show a lack of consent.   * UST
maintains a separate Consenting Relationships policy applicable to students,
faculty and staff that, depending on the circumstances, prohibits or strongly
discourages romantic, intimate or sexual relationships involving person of
unequal power, even when consent is present.  Covered persons are expected
to comply with the Consenting Relationship Policy.

A St. Thomas student who wished to assert a sexual assault complaint against
another student was to initiate the process in one of the following manners: (a) contacting
St. Thomas Public Safety or local police if in an emergency situation, (b) contacting a
"Confidential Resource" made available through St. Thomas, (c) contacting a "Trained
Responder" made available through St. Thomas, or (d) contacting local law enforcement
with or without the assistance of St. Thomas.  Once a student submitted a charge of sexual
assault to St. Thomas, the Policies and Procedures Manual mandated that the following
steps be taken:

Upon receipt of an "Assertion" or "Complaint", the Trained Responder must
promptly notify the Title IX Coordinator as well as the designated Response Manager for
the particular complaint if the Trained Responder was not also the designated Response
Manager.  The designated Response Manager then makes a determination of "whether
interim action is reasonably necessary or appropriate to protect the parties and the broader
UST community, pending completion of the response and resolution process."  If the

designated Response Manager is not available and the Title IX Coordinator determines that immediate action is necessary, the Title IX Coordinator is authorized to take or direct that action.  Examples of interim actions include, but are not limited to:

i.      Establishing a "no contact" order,

ii.     Prohibiting the Respondent from entering or being on St. Thomas property,

iii.    Prohibiting the Respondent from participating in St. Thomas sponsored events,

iv.     Changing the on-campus residency of either the Complainant or the Respondent,

v.      Prohibiting the Respondent from residing in a St. Thomas residence,

vi.     Changing the student or employee status of the Complainant or the Respondent,

vii.    Changing the class schedule of either the Complainant or the Respondent,

viii.   Issuing a timely warning of any substantial threat or danger to the community,

ix.     Making information about orders for protection and harassment restraining orders available to the Complainant, and

x.      Notifying and consulting with appropriate St. Thomas administrators, faculty, and staff members.

Next, the designated Response Manager must appoint a Process Advisor to contact the

Complainant.  If the "formal resolution process" is followed, the Response Manager must also appoint a Process Advisor for the Respondent.  The same Process Advisor can be appointed for both the Complainant and the Respondent and the Response Manager can also serve as the Process Advisor.

The role of the Process Advisor is to promptly meet with the Complainant to:

i.      Review the allegations of sexual misconduct, obtain additional information, and advise or support the Complainant with respect to resolution and process of the complaint

ii.     Inform the Complainant of availability and right to resources,

iii.    Review with the Complainant the policy and procedures governing the process, including: the option to pursue informal or formal resolution processes, the right to contact law enforcement and to pursue civil remedies outside of St. Thomas, the available options for interim action or reasonable accommodations, confidentiality provisions, and the prohibition on retaliation.

iv.     Address the Complainant's questions about the policy and procedures governing resolution of the claim,

v.      Ask the Complainant whether the Complainant wishes to proceed formally or informally, and

vi.     Set up a time for the Process Advisor to have a follow up meeting with the Complainant.

After the Process Advisor meets with the Complainant, the Process Advisor must update the Response Manager regarding the meeting and any further information the

Process Advisor learned about the allegations. If the Complainant does not choose to proceed under the formal process, the Response Manager and the Title IX Coordinator will make a determination of whether the complaint should proceed under the formal process anyway. To do this, the Title IX Coordinator and the Response Manager may consider the nature of the allegations and gather additional information to make the determination.

If the allegations proceed under the "Informal Process", the process cannot result in a disciplinary sanction for the Respondent unless the Respondent is given an opportunity to review and respond to the allegations. Even if disciplinary sanctions do result, they cannot include expulsion or termination of employment. Under the "Informal Process" the following actions may take place: mediation, discussion between the Complainant and the Respondent with appropriate involvement by St. Thomas, a message communicated to the Respondent, or a change in the Complainant's work or class schedule or living arrangement.

If the allegations proceed under the "Formal Process" the following steps are to take place:

1.    Submission of a Signed Complaint. Under this step, the Complainant must submit a signed complaint setting forth the allegations against the Respondent. If the Complainant will not cooperate, the Title IX Coordinator can sign the complaint.

2.    Review of Complaint with Response Manager(s). The Process Advisor reviews the complaint with the Response Manager.

3.    Assignment of a Factfinder. Under this step, the Response Manager appoints a Factfinder or Factfinders to conduct an investigation into the allegations. The

Process Advisor and the Factfinder can be the same person, but when the allegations include force or non-consensual physical contact, the Process Advisor and the Factfinder will generally be different people.

4.      Notice to Complainant. The Response Manager must contact the Complainant to inform him or her of the Complaint, his or her rights, the initiation of a formal investigation, the name of the Process Advisor and the Factfinder, an estimate of time to complete the investigation, any conditions that impact the Respondent's status as a student or employee, and any other information the Response Manager considers important.

5.      Meeting with Respondent. The Process Advisor must meet with the Respondent.  The following must take place at that meeting:

    a.      The Process Advisor must review the allegations with the Respondent and obtain additional information necessary to properly advise or support the Respondent with respect to the response and resolution process,

    b.      Inform the Respondent of available resources and the Respondent's right to access these resources,

    c.      Review the policies and procedures governing the process, specifically noting: the Respondent's rights under the Policies and Procedures Manual, the timing and deadlines for action, the confidentiality provisions, and the prohibition on retaliation.

    d.      Address the Respondent's questions about the policy and procedures, and

7

e.  Set a time for the Process Advisor to follow up with the Respondent

6.  Investigation.  The Factfinder(s) conduct an investigation with the following

steps:

A.  Factfinding Process: The Factfinder(s) conduct a thorough

investigation and impartial inquiry into the facts of the allegations.  They will

seek to interview the Complainant, the Respondent, and any other key

persons having information about the incident.  The Factfinders will also

seek out additional information, documents, and materials they deem

relevant to the investigation.  The Factfinder(s) must ensure that before the

conclusion of the investigation, the parties have been provided a written

summary of all allegations and defenses and have had an opportunity to

respond.  The opportunity to respond includes: (1) an opportunity to identify

relevant witnesses, documentation, and other physical evidence, (2) identify

questions that may be asked of witnesses, and (3) provide responsive written

or oral remarks.

B.  Application of AAUP Principles and Comments Relating to

Academic Freedom:  This applies only where the Respondent is a faculty

member.

C.  Status Updates: The Factfinder(s) must provide updates of the

proceedings at least monthly, which must include, among other things, notice

of any new material allegations or defenses and am opportunity to respond

to the new allegations and defenses.

8

7.     Determination of Responsibility. Using a preponderance of the evidence standard, the Factfinder(s) weigh the evidence and determine if it is more likely than not that the Respondent is responsible for the misconduct alleged.   If the Factfinder(s) determine it is more likely than not that the Respondent committed sexual misconduct, the Factfinder(s) must make a determination that the policies have been violated.

8.     Factfinding Report.  The Factfinder(s) must document their findings of fact and determinations in a report and submit that report to the Response Manager and the Title IX Coordinator.  The Title IX Coordinator must review the report and determine if the report and determination are consistent with St. Thomas policies, procedures, and practices.  If the Title IX Coordinator determines the report and determinations are not consistent with St. Thomas policies, practices and procedures, the Title IX Coordinator has discretion to take appropriate action.  What that action might be is not defined.

9.     Responsive Action by UST.  The Response Manager will review the factfinder's report and determinations and work with appropriate St. Thomas administrators to determine what, if any, sanctions will be imposed or other action taken by St. Thomas.

10.    Notice of Outcome to Complainant and Respondent.  The Factfinder(s) determination or other appropriate notice of outcome will be provided to the Complainant and Respondent in writing.  That writing must include information about  the appeal process, when the outcome will become final and must be sent

9

within ten (10) working days of the Response Manager's receipt of the findings from the Factfinder(s).

After the conclusion of the process, either the Complainant or the Respondent may appeal the results of the formal process.  The grounds available for appeal are:

1.      That a procedural error occurred that substantially affected the outcome of the process,

2.      That the decision was arbitrary and capricious or violated academic freedoms,

3.      The discovery of significant new evidence not previously available that could have affected the outcome, or

4.      That the sanction or other response by St. Thomas was excessively severe or grossly inadequate.

The appeal process includes the following steps:

1.      Submitting an Appeal.  The appealing party must submit a signed written request to the appropriate Appeal Officer within ten (10) working days.  In cases where the Respondent is a student, the Appeal Officer is the Vice President for Student Affairs.

2.      Appointment of an Appeal Board.  In cases where the Respondent is a student, the Appeal Officer can personally consider the appeal or, in his or her discretion, appoint an Appeal Board.  In cases where the Respondent is a staff or faculty member, an Appeal Board consisting of five (5) St. Thomas employees must be appointed.

10

3.      Consideration of Appeal.  The Appeal Officer or Appeal Board, if one has been appointed, will then hear the appeal.  The decision of an Appeal Board must provide the Appeal Officer with a written report of its findings within fifteen (15) calendar days.  The Appeal Officer must notify the Complainant and Respondent, in writing, of the findings of the Appeal Board within ten (10) days.  The Appeal Officer must give the findings of the Appeal Board careful consideration but is not bound by those findings.  An Appeal Officer considering an appeal directly must make written findings and the final disposition of the appeal within ten (10) working days.   The Appeal Officer or Appeal Board decide the appeal subject to the following conditions:

> A.      The Appeal Officer or Appeal Board are not to rehear the case, but rather to consider whether it is more likely than not that the grounds for appeal have been satisfied,
>
> B.      The Appeal Officer or Appeal Board will review the appeal, the factfinding report and consider any previously undiscovered evidence, and
>
> C.      May choose to meet with the parties and consider other additional information in his or her (or its) sole discretion.

4.      No Further Appeal.  No further appeal is allowed under any faculty, staff, or student grievance polices.  However, the President has discretion to modify a decision in exceptional circumstances.

**St. Thomas' Selection of Agents for Involvement in its Sexual Assault investigation team**.

Nora Fitzpatrick was the Title IX Coordinator at St. Thomas in December 2015. (McGraw Dec. Ex. 2 - Fitzpatrick Dep. 7).  She served in that role from May through December of 2014 and then from the summer of 2015 through November 2016. (Fitzpatrick Dep. 18).  During Fitzpatrick's time as Title IX Coordinator, it was not a compensated position and was something she did in addition to her regular position as an associate vice president of financial planning and analysis.  (Fitzpatrick Dep. 18, 9).  When Fitzpatrick became the Title IX Coordinator, there was already a list of people she could choose from to take part in sexual assault investigations.  (Fitzpatrick Dep. 22).  Ms. Fitzpatrick acknowledged that it was the job of the Title IX Coordinator to make sure all these people had the necessary training, but she does not recall having done that. (Fitzpatrick Dep. 22).  Ms. Fitzpatrick testified that she added several people to the list of people who could take part in an investigation.  (Fitzpatrick Dep. 23).  Her criteria to add someone to that list was that the person be recommended to her by someone already on the list and that she believe the recommended person could understand the process and was around campus.  (Fitzpatrick Dep. 23).

**St. Thomas' Training of Agents Involved in its Action Against Plaintiff**.

Testimony from depositions conducted in January 2018 revealed training had been provided to Defendant's staff, both internally and externally, although the extent and content of that training was not revealed or could not be recalled deponents. (McGraw Dec.

Ex. 2 - Nora Fitzgerald Depo. 16:14-17:9; 18:4-8; 19:1-22:4; 22:20-23:3; 27:11-21; 35:19-36:10; McGraw Dec. Ex. 3 - Brad Pulles Depo. 10:20-11:8; 12:15-13:11; 17:4-10).

Further, during their depositions, neither Factfinder, Vern Klobassa nor Jean Giebenhain, was able to recall the specifics of the training they received (McGraw Dec. Ex. 4 - Klobassa Dep 12-13, McGraw Dec. Ex. 5 - Giebenhain Dep. 13, 21-23). However, Mr. Klobassa did recall doing TrainED training when he became a part of the process back in 2009. (Klobassa Dep. 9-12). Both Mr. Klobassa and Ms. Giebenhain recalled they kept the training materials they received. (Klobassa Dep 13, Giebenhain Dep. 13). Working as a Factfinder is a Title IX investigation is not a separately compensated position. (Klobassa Dep. 9-12).

Response Manager Linda Baughman was first involved in the St. Thomas process in her first stint at St. Thomas from 1998 to 2005 and received some training at that time. (McGraw Dec. Ex. 6 - Baughman Dep. 15-16). When she returned to St. Thomas in September 2015, she again underwent Title IX training. (Baughman Dep. 26). Dean Linda Baughman recalled having more than five (5) training sessions with Director of Finance and Planning of Student Affairs Rachel Harris and also meeting with the Title IX Coordinator Nora Fitzpatrick. (Baughman Dep. 29-32). Ms. Baughman also stated she kept her training materials. (Baughman Dep. 32).

Appeal Officer Karen Lange recalled having taken a two (2) day ATIXA training course. (McGraw Dec. Ex. 7 - Lange Dep. 28-31). Ms. Lange also stated she kept her training materials. (Lange Dep. 43).

After these depositions where nearly everyone involved in St. Thomas' process recalled having received training and acknowledged having saved the training materials they received, Plaintiff brought a motion to compel on April 4, 2018.  By an Order dated April 18, 2018, the Court issued an Order requiring Defendant to disclose the training materials sought by Plaintiff.  (Docket 125).  The information obtained below regarding training and application of the Procedures and Policies came from documents disclosed in May 2018.

One of the items Plaintiff received was a spreadsheet showing Title IX investigations conducted by St. Thomas from 2013 to 2015. ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

The training materials that St. Thomas used with the individuals it would involve in its sexual assault investigations was astonishing in the bias it showed, and it was immediately apparent why St. Thomas had been so unwilling to turn this information over until Ordered to do so by the Court.

These documents include the following:

- McGraw Dec. Ex. 9 – UST Fact Finders by Rachel Harris, May 13, 2015 (Starting at Bates 4418).  In this document, at Bates 4423, on a slide titled "Working with a

14

complainant", the Fact Finder is instructed to review with the **complainant** the "Importance of preserving physical evidence."

- McGraw Dec. Ex. 10 – UST Factfinders, by Rachel Harris, January 7, 2015 (Starting at Bates 4601).  This document uses "she" when referring to victims of sexual assault and "him" when referring to perpetrators and the need to sanction perpetrators.  (Bates 4616, 4618, 4617).

- McGraw Dec. Ex. 11 – UST Factfinders & Process Advisor Training: Writing Investigative Reports, General Counsel Abigail Crouse and Rachel Harris, December 9, 2015 (Starting at Bates 4887): training to write a Fact Finder Report uses a template finding a male perpetrator responsible for engaging in sexual intercourse with a female complainant substantially impaired by alcohol, with that conclusion reached by finding the male respondent's testimony to lack credibility. (Bates 4908-4911, Slides 22-25).

- McGraw Dec. Ex.  12 – Recognizing and Working with Stalking Victims by Deirdre Keys (Starting at Bates 4995).  In this document, at Bates 5006, on a paper titled "Campus Dating Violence", the Fact Finder is told "51% of college males admit perpetrating one or more sexual assault during college."

- McGraw Dec. Ex.  13 – Campus Dating Violence (Starting at Bates 6427).  The Fact Finder is told "51% of college males admit perpetrating one or more sexual assault during college."
  - This done even where the Fact Finders were instructed that the level of proof is 50/50 plus a feather to find the perpetrator responsible for

nonconsensual sexual misconduct, (McGraw Dec. Ex. 5 - Giebenhain Dep.

22; McGraw Dec. Ex. 11 – UST Factfinders & Process Advisor Training:

Writing Investigative Reports, Abigail Crouse and Rachel Harris,

December 9, 2015, slide 11 Bates 4897).

- McGraw Dec. Ex. 14 – Strengthening the Response to Sexual Violence, by

  Roberta Gibbons and Peter J. Meagher (Starting at Bates 5120).  Slide 5 of that

  presentations states "Cultural Factors – Violence Against Women is a Norm."  On

  Bates 5123, all six slides are clearly intended to express that sexual violence by

  men against women is the norm.  On Bates 5124, titled "Myths about Sexual

  Assault", the victims spoken of are all female.  On slide 1 of Bates 5125, the Fact

  Finder is told "Gendered difference – Prior victimization is a risk factor for

  perpetration (males) or victimization (females)".   On slide 1 of Bates 5126, titled

  "Who are the perpetrators?" there are handwritten notes showing the male symbol

  and then some hard to read statistics about how many assaults males perpetrate.

- McGraw Dec. Ex. 15 – Campus Checklist – Action Items for IHEs (Starting at

  Bates 5334). The very first slide assigns that there is a "victim" and that term is

  used throughout.

- McGraw Dec. Ex. 16 - Sexual Misconduct Policy Appeal Process, by Nora Fitzpatrick

  dated March 16, 2016[1] (Starting at Bates 3553).  The appeals panel is told that 1 in

---

[1] Though this present postdated John Doe's appeal, Ms. Fitzpatrick indicated that the same general Powerpoint presentation would have been given in John Doe's case as well. (Fitzpatrick Dep. 39-40, 44)

5 women are the victim of attempted or completed sexual assault while in college.
The Appeal board is also told that it is a myth that false reports of sexual assault
are common, with false reports falling in the 2 to 10% range, or to put it another
way, 92-98% of reports are true. The Appeal board is told that it would be
common for a survivor of sexual assault to engage in certain behaviors, like
"Failing to recall or deliberately omitting details," and "Denying, minimizing, or
providing inconsistent explanations of assault."

- McGraw Dec. Ex. 17 Additional Case Studies (Bates 5461), in which the accuser
  in every scenario is female and the accused in every scenario is male.

To summarize, during training, St. Thomas tells the Factfinders and everyone else
involved in the process that 92 to 98% of reports are true and that they need to believe an
accuser, even if the accuser is caught in an outright lie, because that lie might be the result
of being assaulted.  Those involved in the process are also told to find the Respondent
responsible for nonconsensual sexual intercourse using a preponderance of the evidence
standard that is described as 50/50 plus a feather.  (McGraw Dec. Ex. 11 – UST Factfinders
& Process Advisor Training: Writing Investigative Reports, Abigail Crouse and Rachel
Harris, December 9, 2015, slide 11 Bates 4897).

**After being told that male students sexually assault female students, and that
complaining female students don't lie, the Factfinders conduct an investigation and
issue a report in accordance with their training**.







## ARGUMENT

### I. SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue as to a fact exists "if the evidence is such that it could cause a reasonable jury to return a verdict for either party." *Rakes v. Life Investors Ins. Co. of America*, 582 F.3d 886, 893 (8th Cir. 2009). This Court must "view all facts in the light most favorable to the nonmoving party and give the nonmoving party the benefit of all reasonable inferences that can be drawn from those facts." *Widoe v. Dist. #111 Otoe County Sch.*, 147 F.3d 726, 728 (8th Cir. 1998). A fact is material if its resolution affects the outcome of the case. *Rakes*, 582 at 893.

### II. NEGLIGENCE CLAIMS UNDER MINNESOTA LAW

A negligence claim consists of four (4) elements "(1) the existence of a duty of care; (2) a breach of that duty; (3) an injury was sustained; and (4) breach of the duty was the proximate cause of the injury." *State Farm Fire and Cas. v. Aquila Inc.*, 718 N.W.2d 879, 887 (Minn. 2006). Minnesota law imposes "a general duty of reasonable care when the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff." *Domagala v. Rolland*, 805 N.W.2d 14, 23 (Minn. 2011). The existence and scope of a legal duty is generally a question of law for the court, but where there are issues of foreseeability involved, should be submitted to a jury. *Foss v. Kincaide*, 766 N.W.2d 317, 320 (Minn. 2009); *Domagala v. Rolland*, 805 N.W.2d 14, 22 (Minn. 2011).

## III.    DEFENDANT OWED PLAINTIFF A DUTY OF CARE

Defendant asserts that Plaintiff's negligence claim must fail because, even having undertaken to implement and apply a disciplinary procedure that had the potential to find Plaintiff guilty of sexual assault, that would result in life altering consequences for the Plaintiff, it owed him no duty of care.  In making this argument, Defendant cites directly to Minnesota case law which explicitly establishes a duty of care while arguing no duty exists.  Defendant also cites federal cases from other jurisdictions wherein negligence claims were dismissed for considerations specific to those jurisdictions that are not present in Minnesota.

### i. UST, at a minimum, has a duty to not arbitrarily dismiss students.

Under Minnesota law, a private university does have a duty, paralleling those imposed on public universities by due process, not to arbitrarily dismiss students.  *Abbariao v. Hamline University School of Law*, 258 N.W.2d 108, 112-13, (Minn. 1977); *Rollins v. Cardinal Stritch Univ.*, 626 N.W.2d 464 (Minn. App. 2001).  This case law establishing that a private university owes its students this common law duty clearly indicates that the common law principles of negligence apply in a case such as this.

While Defendant's decision to undertake a disciplinary process, and not the existence of Policies and Procedures Manual, is basis for the existence of Defendant's duty in this matter, the Policies and Procedures Manual and the requirements of Title IX are instructive in determining the scope of Defendant's duty to Plaintiff.  *See ServiceMaster of St. Cloud v. GAB Business Services, Inc.*, 544 N.W.2d 302, 307 (Minn. 1996) (stating that

in determining if a duty exists and what it is, court will look to contractual relationships, applicable statutes, the common law, and the conduct of the parties).

At the very least, when St. Thomas undertook to involve itself in the business of conducting investigations and determining whether its students were guilty of sexual assault, or not, it had an obligation to create and administer a process that was fair and impartial to both parties, and, even though it is not the same level of due process as a criminal defendant would receive, provide some measure of due process in the proceeding to ensure that an accurate outcome was achieved.

The case of *Doe v. Brandies Univ.*, 2016 WL 1274533 (D.Mass. 2016), is particularly instructive on how to view the nature of this duty.  While recognizing that Brandeis had an interest in protecting its students and that it did not owe due process to a respondent like would be owed if the respondent was facing incarceration, that Court stated:

> Nonetheless, Brandeis's authority to discipline its students is not entirely without limits.  Although the relationship between the university and its students is essentially contractual, the university's disciplinary actions may also be reviewed by the courts to determine whether it provided "basic fairness" to the student.  While that concept is not well-defined, and no doubt varies with the magnitude of the interests at stake, it is nonetheless clear that the university must provide its students with some minimum level of fair play.

*Doe v. Brandeis Univ.*, 2016 WL 1274533, p. 10-11 (D.Mass. 2016).  In further discussing Brandeis' obligations after it decided to get involved in determining if its students were responsible for committing sexual assaults, that Court went on to state:

> Whether someone is a "victim" is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning.  Each case must

23

> be decided on its own merits, according to its own facts.  If a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself and an impartial arbiter to make that decision.

*Doe v. Brandeis Univ.*, 2016 WL 1274533, p. 12 (D.Mass. 2016).

In summarizing its conclusion that Brandeis did not have an unfettered ability to discipline students when there was so much on the line for the accused, the Court stated: "Put simply, a fair determination of the facts requires a fair process, **not tilted to favor a particular outcome**, and a fair and neutral fact-finder, not predisposed to reach a particular outcome." *Id*. (emphasis added).

Similarly, the Court in *Doe v. University of the South*, 687 F. Supp. 2d 744 (E.D. Tenn. 2009), denied the defendant's motion to dismiss the student plaintiff's negligence claim, analyzing the negligence claim under Tennessee state law.  *Doe v. University of the South*, 687 F. Supp. 2d 744, P. 34-35 (E.D. Tenn. 2009).  In denying the motion to dismiss that Court stated "… in this case a jury could find that the harm caused by the University's allegedly and arguably **haphazard implementation of its own Sexual Assault Policies was foreseeable, especially where here, as there, the harm was severe**: a wrongful conviction by a disciplinary committee." *Id*. at P. 35 (emphasis added).

The Courts in both *Doe v. Brandeis* and *Doe v. University of the South* recognized that when a university undertakes to provide a disciplinary process wherein it will adjudicate a student's guilt or innocence on a claim of sexual assault, the university has an obligation to use reasonable care in creating and implementing the process to avoid causing the foreseeable harm that will result to a student's life from a wrongful sexual assault

24

conviction.  This view is consistent with the law in the State of Minnesota which imposes

a duty to not act arbitrarily in disciplining students. In a case such as this, St. Thomas had,

at a minimum, a duty not to impose serious and highly consequential discipline on students

in an arbitrary manner by administering its process in such a way that it was fair and

impartial to both parties.

### *ii. UST's own policies are instructive on its duty of care.*

The Policies and Procedures Manual and the requirements of Title IX are instructive

in determining the scope of Defendant's duty to Plaintiff.  *See ServiceMaster of St. Cloud*

*v. GAB Business Services, Inc.*, 544 N.W.2d 302, 307 (Minn. 1996) (stating that in

determining if a duty exists and what it is, court will look to contractual relationships,

applicable statutes, the common law, and the conduct of the parties).

In the present case, the most instructive sources of the scope of Defendant's duty

come from the Policies and Procedures Manual Defendant created and from the statutes

and directives set forth by the Federal Government in Title IX and the administrative rules

governing compliance with Title IX.  Throughout its interactions with Plaintiff, Defendant

repeatedly stated to Plaintiff that the proceedings against him would be conducted in

accordance with Defendant's own Policies and Procedures and in Accordance with the

requirements of Title IX.





These documents are specific representations made by Defendant that throughout the process, at the very least, Defendant intended to be bound by and provide Plaintiff with the processes and rights described in the letters and in its Policies and Procedures Manual. The Policies and Procedures Manual is repeatedly represented as the concrete basis of everything Defendant told Plaintiff about what would happen and what rights he had as the matter progressed.

In that sense, the Policies and Procedures Manual that Plaintiff was repeatedly directed toward is the best evidence of Defendant's intent in this matter and its own understanding of its duty toward Plaintiff. *See ServiceMaster of St. Cloud v. GAB Business Services, Inc.*, 544 N.W.2d 302, 307 (Minn. 1996) (stating that in determining if a duty exists and what it is, court will look to contractual relationships, applicable statutes, the common law, and the conduct of the parties).

Among the important provisions of Title IX regulations, as identified by the Office for Civil Rights in 2001, are that schools must provide due process to both parties involved in a sexual misconduct proceeding, which includes, at a minimum:

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment . . .";

- "Adequate, reliable, **and impartial investigation of** complaints, including the opportunity to present witnesses and other evidence";

27

- "Designated and reasonably prompt timeframes for the major stages of the complaint process";

- and "Notice to the parties of the outcome of the complaint . . ."

(Amended Complaint ¶ 22); 2001 Guidance at 20 (emphasis added).  More recently, the Office for Civil Rights has stated that Title IX requires the following:

- A school's "Title IX coordinator [the official charged with compliance] should review the [school's] disciplinary procedures to ensure that the procedures comply with the prompt and equitable requirements of Title IX."

- "Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence, once notified that the police department has completed its gathering of evidence . . . , the school must promptly resume and complete its fact-finding for the Title IX investigation."

- The complainant and the accused student "must have an equal opportunity to present relevant witnesses and other evidence."

- The complainant and the accused student "must be afforded similar and timely access to any information that will be used at the hearing.  For example, a school should not conduct a pre-hearing meeting during which only the [complainant] is present and given an opportunity to present his or her side of the story, unless a similar meeting takes place with the [accused student]."

- "Schools must maintain documentation of all proceedings, which may include written findings of fact, transcripts, or audio recordings."

- "[S]chools [should] provide an appeals process."

- "In sexual violence cases, the fact-finder and decision-maker also should have adequate training or knowledge regarding sexual violence."

- "If an investigation or hearing involves forensic evidence, that evidence should be reviewed by a trained forensic examiner."

(Amended Complaint ¶ 24); Dear Colleague" Letter from Russlynn Ali, Assistant Secretary for Civil Rights, U.S. Department of Education (Apr. 4, 2011), available at http://www2.ed.gov/about/offices/list/ocr/letters/colleagues-201104.pdf.

    Among the provisions contained in Defendant's Policies and Procedural Manuals were the following:

- That the parties will be provided a written summary of all allegations and defenses;

- That the parties will be provided an opportunity to respond to the allegations and defenses, including the opportunity to identify relevant witnesses, documentation, and other physical evidence, identify questions to be asked of witnesses, and provided written or oral remarks;

- After a determination is made, the parties shall be provided notice of the outcome in writing.

(McGraw Dec. Ex. 1- UST Sexual Misconduct Policies and Procedures).

    Given that Federal law mandates and Defendant's own policies claim it will provide the above minimal protections and rights, it is reasonable to hold that Defendant's standard

of care when it undertook to try Plaintiff for sexual misconduct require that it, at a minimum, provide those procedures and rights, in a manner that results in a fair determination of the facts, not tilted to favor a particular outcome, with a fair and neutral fact-finder, not predisposed to reach a particular outcome." *See Doe v. Brandeis Univ.*, 2016 WL 1274533, p. 12 (D.Mass. 2016).

### iii. Federal cases from other jurisdictions dismissing negligence claims are inapposite.

Defendant cites to a number of cases where federal courts have refused to hold that universities owe a duty to care to students during disciplinary proceedings. (Defendant's Memo. P. 22-23). However, review of these cases show that they were not decided on the grounds that a university undertaking an investigation that had the potential to brand the respondent a sexual offender for the rest of his life owes that student no duty. Instead, those courts determined there was no duty of care owed for reasons specific to the laws in those states, which was, frequently, because the student handbooks that outlined the process and policies to be applied was treated as a contract, meaning there could be no negligence claim.

For example in *Doe v. Columbia Coll. Chicago*, 17-CV-00748, ___ F.Supp.3d ___ (2017), that Court stated "Here, based on Illinois precedent, as well as the persuasive case law from other jurisdictions discussed above, the Court finds that CCC does not have a "special relationship" with its students such that a duty arose to protect Doe from the harmful acts of third parties, such as Roe and her friends."

In *Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 228 (D. Mass. 2017), quoted by Defendant, the negligence claim at issue was by the Plaintiff against individual school administrators, which required a special relationship analysis, and, even then, the outcome was dictated primarily by the fact that Court viewed the case as a contract case, stating it "is especially true because the specific rules regarding student disciplinary proceedings are created by contractual relationships between students and colleges." *Austin v. Univ. of Oregon*, 205 F. Supp. 3d 1214 (D. Or. 2016), is similar with that Court noting that the Plaintiffs sought only future lost income damages, which, under Oregon law, would require showing a "special relationship" existed. *Doe v. Trustees of Boston Coll.*, No. 15-cv-10790, 2016 WL 5799297, at *28-29 (D. Mass. Oct. 4, 2016), is also similar, with that Court noting that because the parties agreed the Student Guidelines and Conduct Board Procedure created contractual obligations, a negligence claim could only survive it there was a duty that existed beyond what was required by the contract.

The cases Defendant cites to assert that courts are unwilling to find that a university owes a student a duty to care in disciplinary proceedings do not stand for the idea that a private university can do whatever it wants to impose discipline on a student as Defendant seems to believe. These cases are clear that there is obligation on the school to provide a measure of fairness, but in those cases, rather than look to tort law for that obligation, the Courts appear to be treating student handbooks as contracts that set forth the applicable duty. On the other hand, as discussed above, student handbooks do not create contracts in Minnesota, and Minnesota Courts applying Minnesota law have looked to tort claims to determine and adjudicate the obligations of private universities in imposing discipline on

31

students.  Because of this, the cases cited by Defendant do not control here and provide little support for its position.

### *iv. There is no need for expert testimony to establish a duty to care*

Defendant asserts that Plaintiff's claims must be denied because Plaintiff has failed to present expert testimony as to the standard of care at issue.  (Defendant's Memo. P. 26-28).  Defendant argues that the duty of care that a university owes to a student during disciplinary proceedings is beyond the knowledge of the average juror, and therefore, in the absence of expert testimony, summary judgment must be entered because Plaintiff cannot establish a duty of care.  (Id).

This is not a case where expert testimony is needed.  Making a determination of whether Plaintiff was treated fairly in the proceedings against him, or whether the process St. Thomas created was going to most definitely lead to a partial and biased result are questions that can easily be answered by the average juror.  Concepts of fairness and impartiality in proceedings such that process is fair to both parties, and a result is not predetermined, are things that American citizens understand innately and will be able to determine based on their own experience and understanding.

This is not a complicated product liability case where a jury will be asked to decide if, for example, a pharmaceutical company put its customers at an unreasonable risk of harm by using a certain chemical because it was cheaper, even though a more expensive chemical might have carried a slightly lower risk of a specific harm.  That is the kind of case where the difference between the two chemicals, and why one was chosen over the

other, would be beyond the average juror and require expert testimony. That is not this case.

This case is not even like the case of *AMJ v. Royalton Pub. Schs*. 05-2541 (D. Minn. Dec. 12, 2006), cited by Defendant, where the policy itself was being questioned and there was a need to understand what a proper policy would be. This is a case where a jury is going to be asked to determine whether Plaintiff was treated with the necessary level of fairness and impartiality in a case where the actions of the school have the potential to lead to life altering consequences for Plaintiff by labeling him a sexual offender for the rest of his life.

The jury should be asked to determine whether Defendants process was administered in such a way that it was fair and equitable to both parties where the evidence shows that that Process Advisors, the Fact Finders, the Response Manager, the Appeals Officer, and the Appeal board were all instructed, even before this specific case began, to make a determination by a preponderance of the evidence and then told as a fact that 92 to 98% of sexual assault reports are true, that complaining witness might not remember things, might purposefully omit details, or even outright lie, and that is to be expected, as proof of trauma and overlooked, and that "51% of college males admit perpetrating one or more sexual assault during college."

A jury of Plaintiff's peers will be more than capable of determining whether, in light of the facts that will be presented at trial, St. Thomas provided the Plaintiff with a fair process, "not tilted to favor a particular outcome, and a fair and neutral fact-finder, not

predisposed to reach a particular outcome." *Doe v. Brandeis Univ.*, 2016 WL 1274533, p. 12 (D.Mass. 2016).

## IV.    DEFENDANT BREACHED ITS DUTY OF CARE

Defendant asserts that Plaintiff's negligence claim must fail because, even having undertaken to implement and apply disciplinary proceedings to Plaintiff, Defendant's sole obligation is not to act in an arbitrary manner.  (Defendant's Memo. P. 28).  Defendant goes on to argue that its Policies and Procedures were applied and that both parties were provided an equal opportunity to take part and provide evidence they felt was relevant, apparently, meaning that Defendant has done what it needed to do before determining Plaintiff was responsible for sexual assault and removing him from campus.  (Id. P. 29).

The summary judgment standard is a hard one to achieve and it can be granted only when a reasonable jury could reach only one outcome.  Fed. R. Civ. P. 56(c).  Assuming Plaintiff has been able to establish a duty of care is owed, the facts presented here would certainly allow a reasonable jury to reach the conclusion that the duty was in fact breached by Defendant.

As was discussed above, this starts with the fact that, whatever Defendant professes to desire about a fair proceeding, and whatever is in its Policies and Procedures, those Policies and Procedures are only as good as the training that is executed to meet that policy. If the Policies and Procedures and the training to execute them are not aligned, the culture created by the training can override the stated goals of fairness in the Policies and Procedures.

Plaintiff has shown that, whatever Defendant says in its Policies and Procedures, Defendant started by training everyone involved in this process that 51% of males will commit one or more sexual assault in college, that 92 to 98% of sexual assault reports are true, and that it should not impact the believability of a sexual assault report if the complaining witness does not remember details, omits material facts, or even gives evidence that is an outright fabrication.  Those same participants are then instructed that in order to find the respondent responsible for the alleged sexual assault, they just need to believe it happened using a 50/50 plus a feather standard of proof.

Given just the above, there is enough evidence to allow a jury to conclude that Plaintiff was not provided a procedure involving a fair and neutral fact-finder, not predisposed to reach a particular outcome.  Nothing about a process administered as described above gives any reason to believe it was fair and neutral to both parties. Regardless of what St. Thomas' aspirational goals were, what it did through its training and indoctrination of everyone involved in the process was create a process that was going to lead to a particular and biased result against Plaintiff that he would not be able to overcome.

The people brought into the process are trained to believe that women on college campuses are sexually assaulted by men.  They are told that fake reports of sexual assault are incredibly rare.  They are told that over half of male college students admit to committing a sexual assault in college.  The training that actually implemented Defendant's Policies and Procedures, however great they be for the sake of argument, creates a culture where those involved in the process are working toward a predetermined result and

35

evidence of that is everywhere in the proceedings against Plaintiff. ███████████

████████████████████████████████████████████████████

██████████████████████████

     In addition to the above, there are many other facts that would allow a jury to conclude that Defendant breached its duty to provide Plaintiff a fair process. ██████████

██████████████████████████████████████████████████████





These actions were in violation of clearly stated provisions of the Policies and Procedures, and by failing to adhere to them, Defendant breached its duty to provide Plaintiff with a fair proceeding.

There are more than sufficient facts present in this matter that would allow a jury to conclude that Defendant breached its duty to Plaintiff.  Defendant breached its duty starting with the selection and training of those it involved in the process and that breach manifested itself time and again throughout the proceedings against Plaintiff.  These facts would easily allow a reasonable jury to determine that Defendant did not administer its process in a manner that was fair and impartial to both parties.  Because this is the case, Plaintiff must be permitted to present his claims to a jury.

## V.    PLAINTIFF HAS PRESENTED EVIDENCE OF DAMAGES

Defendant asserts that Plaintiff's negligence claims fail because he cannot prove the essential element of damages.  (Defendant's Memo. P. 30-31).  Defendant argues Plaintiff

has not provided any evidence of economic damages and that in the absence of any physical injury, be cannot be compensated for emotional injuries.  (Id.)

███████████████████████████████████████████████████████████████

Further, there is an exception to this general rule where "there has been some conduct on the part of defendant constituting a direct invasion of the plaintiff's rights such as that constituting slander, libel, malicious prosecution, seduction or other like willful, wanton, or malicious conduct."  *State Farm Mut. Auto Ins. Co. v. Village of Isle*, 122 N.W.2d 36, 41 (Minn. 1963).  The allegations Plaintiff has made, while in the form of a negligence claim, go directly toward the Defendant undertaking an investigation and adjudicating him guilty of having committed sexual assault, which is a direct attack on his character.  It will not be difficult for a jury to understand that Plaintiff would suffer a very serious emotional impact as a result of the Defendant's actions under the circumstances of this case, particularly were Plaintiff's treating psychiatrist may provide testimony regarding Plaintiff's diagnosis, including the physical symptoms.

## <u>CONCLUSION</u>

Because Defendant clearly owed Plaintiff a duty of care in how it conducted the sexual assault investigation against him, and because there are numerous facts which call into question whether Defendant met its duty of providing a process that was fair and did not have a predetermined outcome, Plaintiff requests that Defendant's motion for summary judgment be denied.


Dated: June 20, 2018                             **MCGRAW LAW FIRM, P.A.**


                                                 **/s/Beau D. McGraw**
                                                 _____
                                                 Beau D. McGraw, I.D. No.: 31190X
                                                 Attorney for Plaintiff
                                                 10390 39th Street North, Suite 3
                                                 Lake Elmo, MN 55042
                                                 Telephone:  (651) 209-3200
                                                 beau@mcgrawlawfirm.com