# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| JOHN DOE, | Civ. No. 16-1127 (JRT/DTS) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| UNIVERSITY OF ST. THOMAS, | |
| Defendant. | |

Beau D. McGraw, **McGraw Law Firm, PA**, 10390 Thirty-Ninth Street North, Lake Elmo, MN 55042, for plaintiff.

David A Schooler, Ellen A. Brinkman, and Maren F. Grier, **Briggs & Morgan, PA**, 80 South Eighth Street, Suite 2200, Minneapolis, MN 55402, for defendant.

Plaintiff John Doe ("Doe") brought this action against the University of St. Thomas ("UST"), a private university, stemming from UST's investigation of a sexual misconduct complaint made against him. Doe originally brought six causes of action; however, the Court dismissed five of them, and the only remaining cause of action is one based on negligence. UST now moves for summary judgment on the negligence claim. The Court finds that UST owed Doe a duty of reasonable care, but because UST did not breach its duty of care, the Court will grant the Motion.

## **BACKGROUND**

## I.      UST'S SEXUAL MISCONDUCT POLICY

The events giving rise to this action occurred in December 2015. At that time, UST had a Sexual Misconduct Policy (the "Policy") that set forth guidelines UST would follow when

investigating allegations of sexual misconduct.  (Decl. of Linda Baughman ("Baughman Decl."),
¶ 3, May 30, 2018, Docket No. 150.)  The Policy's "provisions [were] intended to be flexible so
as to allow UST to meet its legal obligations while fulfilling its educational mission." (Baughman
Decl., Ex. 1 ("UST Policy") at 15, Docket No. 150-1.)

The Policy contained both formal and informal resolution processes.  At the initiation of
the formal resolution process, a "Response Manager" would be appointed to take interim actions
and manage the investigation as it began.  (*Id*. at 16–17.)  The Response Manager would also
appoint "Factfinders."  Factfinders were responsible for "conduct[ing] an investigation into the
facts of the incident" and notifying both the complainant and the respondent of the results.  (*Id*. at
21.) The Factfinders would conduct interviews, offer written summaries of the charges and results
to the complainant and respondent, and give both the complainant and the respondent an
opportunity to participate at various points along the way.  (*Id* at 23.)  Both the complainant and
the respondent could identify witnesses, provide documents and other evidence, submit questions
for the Factfinders to ask witnesses, and supply responsive statements.  (*Id*.)

After completing the investigation, the Factfinders would "weigh the evidence and
determine whether it [was] more likely than not (using a 'preponderance of the evidence' standard)
that the [r]espondent [was] responsible for the misconduct alleged." (*Id*. at 24.)  If the Factfinders
made such a finding, a determination would be made that the Policy had been "violated," a report
would be prepared, and the Response Manager would determine the appropriate sanctions. (*Id*. at
24.)  UST would then provide a written notification of the Factfinders' decision to both the
complainant and respondent and give both the opportunity to appeal.  (*Id*. at 25–26.)  If the
respondent was a student, the Vice President for Student Affairs would be designated as the Appeal
Officer.  (*Id*. at 26.)  The Appeal Officer would have the option to consider the appeal directly or

to appoint an appeal board.  (*Id*. at 26–27.)  If appointed, an appeal board would consider the appeal and present a non-binding recommendation to the Appeal Officer, who would then make the final determination.  (*Id*. at 27.)

To assist students in the process, the Response Manager would also appoint Process Advisors, who would "explain the response and resolution process and provide information about available resources" to both the complainant and the respondent.  (*Id*. at 18.)  Additionally, students were allowed a support person.  (*Id*. at 21.)  A support person could "accompany [the student] throughout the response and resolution process . . . to consult with and advise" the student.  (*Id*.)

## II.     THE INCIDENT

Doe was a freshman at UST in 2015.  (Am. Compl. ¶ 1, May 20, 2016, Docket No. 34.)  On the night of December 11, 2015, both he and Jane Doe, the complainant, attended an off-campus party.  (*Id*. ¶ 30, 36.)  Later that evening, Doe walked Jane Doe back to her dorm room and the two began consensually kissing in the dorm's common room.  (*Id*. ¶ 46.)  The two eventually ended up in the bathroom connected to Jane Doe's dorm room, where they continued kissing and removed some of their clothing.  (*Id*. ¶¶ 56–60.)  Then, Doe digitally penetrated Jane Doe.  (*Id*. ¶ 62.)  Jane Doe did not verbally consent nor did she verbally object.  (Decl. of Vern Klobassa ("Klobassa Decl.") ¶ 4, May 30, 2018, Docket No. 170, Ex. 1 ("Factfinders' Report") at 9, Docket No. 171.)  Doe left the dorm room shortly thereafter.  (Am. Compl. ¶ 70.)  The next morning, Jane Doe reported the incident to UST, and UST began a formal investigation of the incident on December 14, 2015.  (Klobassa Decl. ¶ 8, Ex. 5, Docket No. 175.)

## III.    THE INVESTIGATION

Linda Baughman, the Dean of Students at UST, was the designated Response Manager.  (Baughman Decl. ¶ 1.)  On December 14, 2015, Baughman sent Doe an email to inform him about

Jane Doe's complaint.  (Baughman Decl. ¶ 6, Ex. 4, Docket No. 153.)  Shortly thereafter, Doe received a second letter from Dean Baughman, which advised Doe about his rights under the Policy and identified the Factfinders. (Baughman Decl. ¶ 9, Ex. 7, Docket No. 156.)  As the investigation commenced, Doe, Doe's father, and Doe's attorney attended a meeting with Dean Baughman and UST's Associate General Counsel Abigail Crouse, the purpose of which was to "answer questions [Doe] and his father ha[d] about the process," and to allow Doe's attorney to "learn . . . how the process works."[1]   (Am. Compl., Ex. 4 at 1, Docket No. 34-4.)

In the ensuing weeks, the Factfinders conducted interviews, reviewed security footage, and reviewed evidence provided by both Doe and Jane Doe.  The Factfinders first interviewed Jane Doe and Doe on December 21 and 22, respectively.  (Factfinders' Report at 3.)  Doe's lawyer was present at his interview.  (Klobassa Decl. ¶ 12, Ex. 9 at 1, Docket No. 178.)  After the interviews, Doe and Jane Doe provided the Factfinders with evidence and the names of witnesses they believed had relevant information.  (Factfinders' Report at 7, 11.)  Additionally, Doe and his attorney were asked to provide suggested questions for the witnesses they identified.  (Klobassa Decl. ¶ 13, Ex. 10, Docket No. 179.)

---

[1] Shortly after this meeting, Doe's attorney apparently made clear that he intended to reach out to several witnesses and record interviews with them.  (Decl. of Beau McGraw ("McGraw Decl.") ¶ 23, June 20, 2018, Docket No. 241, Ex. 23 ("Crouse Dep.") at 22, Docket No. 264.) Crouse cautioned Doe's attorney against that plan of action.  Crouse stated that "if witness testimony appears planned or influenced, it will hurt the witness's credibility and is likely to hurt the credibility of your client if he is seen as trying to influence their testimony." (*Id.*) For those reasons, and because the Factfinders would interview each of the relevant witnesses anyway, she cautioned that conducting outside interviews "is not appropriate under our process and will harm your client more than help."  (*Id.*) Nevertheless, Doe's attorney conducted five independent interviews and provided recordings of those interviews to Crouse and the Factfinders. (Factfinders' Report at 11.)

The Factfinders interviewed eleven other individuals during the investigation, including Jane Doe's roommate, her Resident Advisor, two health care professionals, and several individuals who interacted with both parties on the night of December 11 and the morning of December 12. (Factfinders' Report at 1–2, 4.)  The Factfinders also viewed text messages between Doe and Jane Doe, security footage from Jane Doe's dorm, a report from the St. Paul police department, and Jane Doe's relevant medical records.  (Factfinders' Report at 3, 7, 11.)   After reviewing this evidence, the Factfinders separately interviewed both Doe and Jane Doe a second time, presented both with the evidence, and asked pertinent follow-up and clarifying questions.  (Klobassa Decl. ¶¶ 10, 12; Ex. 7, Docket No. 177; Ex. 9, Docket No. 178.)

On February 10, 2016, Doe and his attorney attended a meeting with Crouse and Dean Baughman.  (Am. Compl. ¶ 144.)  Doe was informed that "he had been found responsible for non-consensual sexual intercourse."  (*Id.*)  As a result, Doe was suspended from UST for three semesters, which was—at that point—until the beginning of the 2017 fall semester.  (Baughman Decl. ¶ 10, Ex. 9, Docket No. 157.)  On March 10, 2016, Doe appealed the decision.  (Decl. of Karen Lange ("Lange Decl.") ¶ 3, May 30, 2018, Docket No. 165, Ex. 1 (the "Appeal"), Docket No. 166.)  Karen Lange, the Vice President of Student Affairs, was named the Appeal Officer. (Lange Decl. ¶ 3, Ex. 3 at 1, Docket No. 168.)  She appointed an Appeal Board, who considered Doe's appeal and determined that none of the grounds to overturn a decision were applicable.  (*Id.*) Lange agreed with the Board's recommendation and upheld the Factfinders' original determination.[2]  (*Id.* at 2–3.)

---

[2] Because Doe had been attending classes pending the outcome of his appeal, Lange also adjusted the suspension to run until the spring semester of 2018.  After his appeal was denied, John Doe transferred to another university. He does not plan on re-enrolling at UST.  (Decl. of Maren Grier ¶ 5, May 30, 2018, Docket No. 136, Ex. 3 ("Doe Dep.") at 14, Docket No. 139.)

## IV.    PROCEDURAL BACKGROUND

On May 20, 2016, Doe filed an Amended Complaint alleging that UST violated Doe's rights through its application of the Policy.  The Amended Complaint alleged six causes of action: (1) Declaratory Judgment under Title IX (Count I); (2) Violation of Title IX – Erroneous Outcome (Count II); (3) Violation of Title IX – Deliberate Indifference (Count III); (4) Breach of Contract (Count IV); (5) Breach of the Covenant of Good Faith and Fair Dealing (Count V); and (6) Negligence (Count VI).  (Am. Compl. ¶¶ 158–211.)  On March 1, 2017, the Court dismissed the first five counts.  (Mem. Opinion and Order, March 1, 2017, Docket No. 63.)  UST now moves for summary judgment on the negligence claim.  (Mot. for Summary J., May 30, 2018, Docket No. 128.)

## DISCUSSION

## I.    STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

UST argues that Doe is not able to prove the elements of his negligence claim.   In Minnesota, a negligence claim requires a showing of four elements: that (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached that duty of care; (3) the plaintiff was injured; and (4) the defendant's breach of the duty of care was the proximate cause of the injury. *Glorvigen v. Cirrus Design Corp.*, 816 N.W.2d 572, 581–82 (Minn. 2012).   The arguments at this stage revolve mainly around the first two elements.

## II.    DUTY OF CARE

In Minnesota, a defendant owes "a general duty of reasonable care when the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff."  *Domagala v. Rolland*, 805 N.W.2d 14, 23 (Minn. 2011).   While this overarching concept is well-established, courts in Minnesota have not yet applied it in the context of a challenge to a sexual assault investigation by a private college or university. More broadly, using negligence to challenge such investigations is a relatively new and untested legal strategy in Minnesota.   As such, the Minnesota Supreme Court has not been asked to address the precise issues presented in this case.   Nevertheless, the Court finds guidance in analogous Minnesota Supreme Court and Court of Appeals cases.

In *Abbariao v. Hamline Univ. Sch. of Law*, 258 N.W.2d 108 (Minn. 1977), the Minnesota Supreme Court considered the case of a law student who had been expelled from Hamline for poor grades.  The plaintiff there, Abbariao, claimed that his expulsion was the result of a flawed process because Hamline failed to inform him of many of his grades, failed to notify him of his probationary status until four weeks before a finals period, and expelled him without conducting a hearing.  *Id*. at 110.

Abbariao first alleged that his procedural due process rights had been violated.   In examining this argument, the Minnesota Supreme Court noted that "[d]etermination of the process

due necessitates a balancing of the interests and needs of the student against the interests and resources of the university." *Id.* at 112.  The Supreme Court further explained that the process due depends on whether an expulsion is based on misconduct or academic deficiencies.  This is an important distinction, as "[e]xpulsion for misconduct triggers a panoply of safeguards [under the Due Process Clause] designed to ensure the fairness of factfinding by the university." *Id.*  On the other hand, courts may intervene for academic expulsions only if the expulsion is the result of "arbitrary, capricious, or bad-faith actions of university officials." *Id.*

Because the Due Process Clause applies only to public universities, Abbariao also alleged "a common-law duty on the part of the law school not to expel students in an arbitrary manner." *Id.*  In discussing this argument, the Supreme Court held that "[t]he requirements imposed by the common law on private universities parallel those imposed by the due process clause on public universities." *Id.* at 113.  Because Abbariao was expelled for academic deficiencies, the more lenient arbitrariness standard applied.

The Minnesota Court of Appeals extended this reasoning in *Rollins v. Cardinal Stritch Univ*, 626 N.W.2d 464 (Minn. Ct. App. 2001).  Rollins, a male student, had sent several unsolicited emails to female students, prompting complaints.  As the university investigated those complaints, Rollins continued sending unwanted emails.  Rollins was notified of his immediate suspension pending a hearing.  At that hearing, which his attorney attended, Rollins showed little remorse and stated that he wouldn't change his behavior.  Accordingly, the university told him that he could not repeat his behavior and had to switch out of the specific student section he was in if he wanted to be reinstated.  Rollins refused, and thus was never reinstated.  In suing the university, Rollins argued that the university's disciplinary actions "were unfair, biased, arbitrary, lacking in due process, and based on the bad faith" of the university.  *Id.* at 469.  Following *Abbariao*, the court

explicitly held that the "common law imposes a duty on the part of private universities not to expel students in an arbitrary manner." *Id.* at 470.  Analyzing the university's actions under this standard, the court held that the expulsion was not arbitrary.  *Id.*

As *Abbariao* and *Rollins* make clear, although private universities are not subject to the Due Process Clause, they do not escape judicial oversight entirely when seeking to discipline their students.  To the contrary, private universities have a common law duty not to act arbitrarily in handling disciplinary matters.  Although not based on negligence, the Court finds the cases sufficiently analogous to support finding a duty of reasonable care here.[3]

In making this finding, the Court bears in mind that universities are entitled to discretion in dealing with their students, including in disciplinary proceedings.  *See Goss v. Lopez*, 419 U.S. 565, 589–90 (1975) (Powell, J., dissenting) ("In prior decisions, this Court has explicitly recognized that school authorities must have broad discretionary authority . . . [t]his includes wide latitude with respect to maintaining discipline and good order."); *see also Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999) ("courts should refrain from second-guessing the disciplinary decisions made by school administrators.").

But the Court does not believe that unfettered discretion is appropriate.  The relationship between student and university is a unique one.  Universities are, for all intents and purposes, societies within a society.  These sub-societies often have their own sets of rules, manifested in the form of student handbooks.  Naturally, these handbooks establish student academic requirements and university academic duties.  Rules in this regard are necessary to sustain a productive and fair academic culture.  But the universities and colleges of today are not just responsible for providing

---

[3] The Court is similarly unpersuaded that the difference between an expulsion and a suspension—such as the one here—warrants different treatment.

a productive and fair academic environment; they are also expected to ensure a healthy and safe living environment. Thus, handbooks contain rules governing the non-academic behavior of students. Rules to this end often apply both on- and off-campus, requiring students to conduct themselves in accordance with stated university requirements wherever they are.

In many instances, violations of university handbooks have consequences only felt within the university environment. But they can also have consequences that extend far beyond that environment and can affect students in significant and permanent ways. Of course, students voluntarily accept the rules of the university they attend. They are, or should be, aware of the ramifications of violating those rules. The issue, therefore, is not whether universities have the **ability** to discipline their students in ways that give rise to severe consequences. Instead, given the harm that can come from that discipline, and given the unique relationship between student and university, the question is whether a private university must use reasonable care before making disciplinary decisions. The Court today holds that they must.

Precisely what reasonable care requires is beyond the scope of this decision. Whether a given university exercised reasonable care will, like most negligence claims, depend on the circumstances of each case. "However, the fact that it may be difficult to establish 'precise criteria' by which to judge a defendant's actions does not mean that the defendant owes others no duty." *Atria v. Vanderbilt Univ.*, 142 F. App'x 246, 251 (6th Cir. 2005) (citing *Stehn v. Bernarr MacFadden Foundations, Inc.*, 434 F.2d 811, 815 (6th Cir. 1970)).

UST argues that the Court should adopt something like the "arbitrary" standard found in *Rollins* and *Abbariao.* The Court disagrees. As noted above, the *Abbariao* court explicitly noted that required due process protections differ depending on whether a disciplinary decision is based on academic deficiencies or student misconduct. For review of academic violations, the Minnesota

-10-

Supreme Court held that the arbitrary standard applies. But for misconduct violations, the common law provides students a "panoply of safeguards designed to ensure the fairness of factfinding." *Abbariao*, 258 N.W.2d at 112. It was for academic violations which the Minnesota Supreme Court held that the arbitrary standard applies. Thus, when the Supreme Court stated that "the requirements imposed by the common law on private universities parallel those imposed by the due process clause on public universities," it necessarily implied that something more than the arbitrary standard would apply to university disciplinary actions based on student misconduct. Certainly, whether an investigation or decision was arbitrary will factor into a reasonable care analysis. But that a decision was non-arbitrary is insufficient, by itself, to establish reasonable care.

On the other hand, Doe suggests that UST's Policy and Procedure manual provides the applicable duty of care, and that a failure to adhere to that manual constitutes a breach of duty. Once again, the Court disagrees. Reasonable care does not require strict adherence to a university's handbook, just as a university handbook is not considered binding in a due process analysis. *See Keefe v. Adams*, 840 F.3d 523, 536 (8th Cir. 2016) (rejecting the argument that a university's policies could be used to "create an expectation" which, if not met, would violate due process). University policies and procedures are fundamental to the operation of the university environment, as they often provide the guiding principles in the relationship between university and student. However, they are intended to, and must be, flexible, in order to account for the unique circumstances of each situation. If courts were to require strict adherence, the purpose and utility of the handbooks would be undercut, not bolstered. This is, in part, why Minnesota courts have been "generally reluctant to find contractual obligations between students and their schools

based upon student handbooks." *Shank v. Carleton College*, 232 F. Supp. 3d 1100, 1116 (D. Minn. 2017) (citing *Rollins*, 626 N.W.2d at 470).

Doe also argues that UST "had an obligation to create and administer a process that was fair and impartial to both parties . . . and [to] provide some measure of due process in the proceeding to ensure that an accurate outcome was achieved." (Pl.'s Mem. in Opp. at 23, June 20, 2018, Docket No. 241.) While vague, the Court believes that this is a closer application of the *Abbariao* decision and of the parallel due process protections afforded students at public universities. "Due process is flexible and calls for such procedural protections as the particular situation demands." *Keefe*, 840 F.3d at 535 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)). What constitutes reasonable care must also be flexible.

## III.   BREACH

Having determined that UST owed Doe a duty of reasonable care, the Court must now analyze whether UST breached that duty during its investigation. Doe's breach argument is two-fold. First, he argues that UST breached its duty of care to provide him a fair hearing because the individuals adjudicating and investigating his claim had been indoctrinated with bias against men accused of sexual assault. Second, he argues that procedural flaws throughout the process, when considered together, amount to a breach of the duty of reasonable care.

### A.  Bias as Breach

In arguing that UST's administrators had a bias against him, Doe highlights training materials that UST provided these administrators on the increasingly salient issue of campus sexual assault. The types of things that Doe takes exception to can fairly be categorized as: (1) gender-slanted language used in training materials; (2) training about how victims of sexual assault

typically behave following the assault; and (3) statistics about campus sexual assaults and the low rate of false reports.

When it exists, bias certainly provides some indication that a university failed to use reasonable care in conducting its investigation. Indeed, fundamental to any fair investigation and hearing is that the tribunal is unbiased and the outcome not predetermined. However, none of the factors cited by Doe, when viewed in context, establishes that UST or those involved in Doe's adjudication were impermissibly biased such that UST failed to exercise reasonable care.

University "administrators are 'entitled to a presumption of honesty and integrity unless actual bias . . . can be proven.'" *Richmond v. Fowlkes*, 228 F.3d 854, 858 (8th Cir. 2000) (quoting *Ikpeazu v. Univ. of Nebraska*, 775 F.2d 250, 254 (8th Cir. 1985)); *see also Robinson v. Univ. of Minnesota*, No. A17-1620, 2018 WL 4395020, at *3 (Minn. Ct. App. Sept. 17, 2018) ("the party claiming otherwise has the burden of proving that a decision was made improperly by showing a risk of actual bias") (citing *Kennedy v. L.D.*, 430 N.W.2d 833, 837 (Minn. 1988)) (emphasis omitted). Where a plaintiff relies only on his or her belief that administrators acted with bias, the presumption is not overcome. *See de Llano v. Berglund*, 282 F.3d 1031, 1035 (8th Cir. 2002).[4]

This presumption is a common one across the country and has been applied in similar cases to this one. For instance, in *Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 31–32 (D. Me. 2005), the mere fact that a hearing board chair had participated in sexual assault victim advocacy programs was insufficient to prove bias. The court in that case refused to presume that, "because

---

[4] Even though the cited cases dealt with public universities and therefore considered bias in the due process context, the principles apply equally here. "The requirements imposed by the common law on private universities parallel those imposed by the due process clause on public universities." *Abbraio*, 258 N.W.2d at 113.

someone is against sexual assault, [he or she] would be unable to be a fair and neutral judge as to whether a sexual assault had happened in the first place." *Id.*

*Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 602 (S.D. Ohio 2016), is another remarkably similar case. There, a plaintiff complained that "training materials that allegedly presume that sexual assault complainants are truthful and that elevate the rights of the complainants over the due process rights of the accused" impermissibly conditioned the adjudicatory body against the accused. The court disagreed and stated that, without concrete facts showing actual bias, "such as statements by board members or university officials indicating bias," a plaintiff could not show that an adjudicatory panel was biased. *Id.* at 601–02. The court went on to say that, instead of holding training against a university, "[i]t should be a laudable goal for a university to raise the awareness of its faculty and staff to sexual assault and to increase their sensitivity to the particular problems that victims of sexual violence experience in coming forward to make complaints." *Id* at 602.

Doe has not provided any facts suggesting that those involved in his adjudication process were actually biased against him; nowhere does he show any connection between the training that UST administrators were given and bias in his specific case. Instead, he relies on bare platitudes such as arguing that the "training and indoctrination of everyone involved in the process [created] a process that was going to lead to a particular and biased result" and that "those involved in the process are working toward a predetermined result and evidence of that is everywhere in the proceedings against" Doe. (Pl.'s Mem. in Opp. at 35–36.) Doe does not overcome the presumption of fairness that should be afforded to UST administrators. Instead, Doe would have the Court presume just the opposite, and hold that university training aimed at gaining a greater understanding of sexual violence, and which uses materials backed by research, presumptively

biases administrators against accused males.   The Court refuses to make such a presumption. Accordingly, Doe's argument that UST's bias establishes a breach of reasonable care is without merit.

### B.  Procedural Deficiencies as Breach

Doe's second complaint is with alleged procedural flaws throughout the process.   Doe argues that UST's Policy and Procedures manual, and relevant Title IX guidance, are instructive of the scope of reasonable care, such that a failure to comply with them evidences a breach.   As discussed above, the Court does not believe that strict adherence to a university's policies and procedures is required for a university to satisfy its duty of reasonable care.   However, adherence to school policy is also not irrelevant when considering whether that duty has been breached.   As evidenced in UST's policies, there will often be substantial overlap between procedures employed in university handbooks and those procedures that courts consider indicative of a fair investigation. Thus, when—as here—a university relied on and sought to follow its own policies, evidence that it failed to do so may provide evidence of a university's failure to use reasonable care.

Doe points to a number of alleged discrepancies and improprieties on the part of UST. However, Doe does not point out any specific provisions of the Policy, or relevant Title IX guidance, that these alleged improprieties violated.   At his most specific, he says that UST failed to adhere to its own Policy by: (1) denying Plaintiff access to information he needed to identify people and documents favorable to his defense; (2) refusing Plaintiff access to the written findings against him; and (3) even when providing "access, " doing so only for his counsel and then only to heavily redacted documents.   (Def.'s Mem. in Opp. at 38, June 20, 2018, Docket No. 240.) However, none of these actions violated the Policy.

As to the first category, Doe seems to be under the erroneous impression that he would be able to mount something of a full defense and become intricately involved in the investigatory process. To the contrary, the Policy clearly established that the Factfinders were responsible for all aspects of the investigation, that they would conduct the investigation at an arms-length from the parties, and that they would seek input from the parties only when they needed it. UST's policy was never intended to provide the protections of a trial. Instead, the Policy states that, before the Factfinders finished, they would ensure that both parties were "provided a written summary of all allegations . . . and []an opportunity to respond," including "(1) an opportunity to identify relevant witnesses, documents, and other physical evidence, (2) identify questions that may be asked of witnesses, and (3) provide responsive written or oral remarks." (UST Policy at 23.) UST did all those things.

The alleged wrongdoings cited in categories two and three, while potentially violations of the Policy if true, do not form the basis for a violation in this case. Doe was not prohibited from accessing the written Factfinders' report, though his access was restricted insofar as he or his lawyer were forced to come to campus to view the report. And while the names of the witnesses were redacted in the report made available to Doe, there was not "heavy" redaction, as Doe alleges.

Of course, the Court's inquiry is not limited to considering whether UST violated its own policies. It is entirely plausible that UST, or any university, could breach its duty of care without violating its policies, if the application of those policies does not provide reasonable care. Thus, even though Doe does not plausibly show that UST violated its policy, the Court must otherwise consider whether his allegations demonstrate a breach of the duty of reasonable care. In doing so, the Court finds that most of the facts Doe cites as evidence of breach are either mischaracterized

or otherwise fail to establish that UST did not exercise reasonable care, even when viewed in the aggregate.

For instance, Doe argues the fact that Jane Doe was found credible by the Factfinders, even after initially lying or omitting facts when speaking to St. Paul Police and UST investigators, is evidence that UST was not impartial.  He contends that this fact is particularly egregious because she was allegedly never confronted about her inconsistencies.  However, the Factfinders **did** question her about these inconsistences during their second interview with her.  (See Complainant Interview, May 30, 2018, Docket No. 177.)  The Factfinders also challenged Doe about his own inconsistences during his second interview, and found him credible as well.

Doe also complains that "during the investigation process" Dean Baughman was in "constant communication" with Jane Doe's Process Advisor, who was telling Dean Baughman that Jane Doe was courageous and strong.  (Def.'s Mem. in Opp. at 36.)  However, as evidence, Doe cites a single email from the Process Advisor to Dean Baughman.  While the email does say that Doe was courageous and strong, it was in reference to how Jane Doe was handling the news that Doe had decided to appeal the decision.  The email was written on February 29, 2016, **after** Dean Baughman had received the report by the Factfinders and **after** she had made her disciplinary decision.

Doe further claims that he was prohibited from conducting his own investigation into the matter.  This seems to be in reference to General Counsel Abigail Crouse's warning him against conducting his own interviews of witnesses.  As discussed above, instead of telling Doe that he could not interview witnesses, Crouse simply warned Doe that affirmatively interviewing witnesses may make them appear coached when the Factfinders finally interviewed them, and that

any appearance of coaching would harm a witness's credibility.  For this reason, she stated that conducting interviews may "harm your client more than help."[5]  (Crouse Dep. at 22.)

This is not to say that UST's actions were flawless, and the Court does believe that UST acted improperly on two occasions.  First, while Dean Baughman was writing the final disposition letter to Doe to inform him of the Factfinder's determination and the punishment she was imposing, she sent a draft to VP Lange, who would go on to be the Appeal Officer, and asked for suggestions or edits.  (*See* Declaration of Beau McGraw ("McGraw Decl.") ¶ 9, June 20, 2018, Docket No. 241, Ex. 7 ("Lange Dep.") at 25, Docket No. 248.)  Second, just six days after Doe received notice of the decision, Baughman emailed Lange, asking if Doe had appealed the decision and stating that she didn't see any of the grounds for appeal being applicable.  (Lange Dep. at 26.)

Because Baughman and Lange were, respectively, the overseer of Doe's original investigation and the overseer of Doe's appeal, their contact in this case raises questions.  At a minimum, it gives the impression that Lange was involved with the original disposition of the case, or that Baughman was priming Lange on the issue before Lange took up the appeal.  Either is undesirable.  Ideally, there is complete separation between the two levels of the adjudicatory process.  However, the Court is unpersuaded that this contact indicates a breach of UST's duty of care.  UST utilized an Appeal Board in this case, consisting of five members who were trained in UST's policies and had no role in the original adjudication.  The Appeal Board heard and considered the appeal, and ultimately recommended to Lange that it be denied.  Thus, the contact between Lange and Baughman, while arguably improper, was likely harmless.

---

[5] Doe also takes issue with Crouse's statement in front of Baughman that the state "always" declines prosecution in "he said she said" cases.  It is unclear what Doe thinks was wrong with this statement, and it seems to simply reflect the reality that criminal prosecutions come with a high standard of proof that often provides a barrier for sexual assault claimants.

Although the Court finds that UST owed John Doe a duty of reasonable care, even considering all of the facts in a light most favorable to Doe, Doe cannot show a genuine issue of material fact as to UST's alleged breach.  The Court therefore concludes that no reasonable jury could decide that UST breached its duty of care.  As such, Doe "fails to make a showing sufficient to establish the existence of an element essential" of his case.  Accordingly, the Court will grant summary judgment for UST.[6]

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that UST's Motion for Summary Judgment [Docket No. 128] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  February 21, 2019                    _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                        JOHN R. TUNHEIM
                                                           Chief Judge
                                                  United States District Court

---

[6] UST alternatively argues for summary judgment based on Doe's failure to identify an expert.  UST contends that an expert is required in cases such as this.  As the Court grants summary judgment because Doe cannot establish breach, it need not reach the expert issue.  Nevertheless, the Court notes that an expert is not always necessary in cases involving standards of care.  Generally, "when the standard of care centers around the exercise of professional judgment, it must be proven by expert testimony."  *A.M.J. v. Royalton Pub. Sch.*, Civ. No. 05-2541, 2006 WL 3626979, at *3 (D. Minn. Dec. 12, 2006).  "[I]f it would be speculative for the factfinder to decide the issue of negligence without having the benefit of expert testimony on the standard of care, the expert testimony is necessary."  *Atwater Creamery Co. v. W. Nat. Mut. Ins. Co.*, 366 N.W.2d 271, 279 (Minn. 1985).  In the present case, a jury would be asked whether the university exercised reasonable care in conducting its disciplinary proceeding.  This question necessarily centers around issues like fairness and impartiality, issues that the average citizen can consider without the help of an expert.  Were the Court to decide this issue, the Court would likely find an expert to be unnecessary.